MOORE, Judge.
This court’s opinion of November 7, 2008, is withdrawn, and the following is substituted therefor.
J.B. (“the father”) appeals from a judgment of the DeKalb Juvenile Court (“the juvenile court”) terminating his parental rights to his two natural children to allow for their adoption by J.N. and M.N. We reverse and remand.
Facts[1]
In July 2001, the DeKalb County Department of Human Resources (“DHR”) *103 opened a protective-services case regarding A.B. and Ju.B.,[2] the children born of the marriage between the father and T.B. (“the mother”). DHR received reports that the father was in jail serving 40 days for a conviction of driving under the influence and that the mother was not properly caring for the medical and hygiene needs of the children. DHR attempted to teach the mother parenting and housekeeping skills; however, the mother did not seem to be able to learn. DHR then petitioned the juvenile court to obtain custody of the children, which petition was granted in October 2001. Subsequently, a psychological evaluation showed that the mother had an IQ of 58 and that she could not properly parent the children because of her mental deficiencies. However, DHR and the juvenile court determined that the father was capable of caring for the children. DHR eventually worked out a plan pursuant to which the children could be placed in day care until the end of the father’s workday, after which he would take over their primary care. In December 2002, the juvenile court returned physical custody of the children to the parents based on that plan. On September 29, 2003, the parents obtained full physical and legal custody of the children. Although the September 29, 2003, judgment did not place any limitations on the mother’s custodial authority, DHR and the father understood that the mother would not be left alone to care for the children.
DHR had no further involvement with the family between September 2003 and 2006. During that time, the father worked at a series of three jobs while the children stayed in day care and he acted as the primary caregiver for the children when he was not working. The mother assisted the father with child care, but mainly she kept house; the mother did not work because of her mental disability, and she received a monthly Supplement Security Income (“SSI”) check from the Social Security Administration.
On July 31, 2006, the father, who was an illegal immigrant,[3] returned to his native country of Guatemala to obtain a visa so he could legally reside in the United States.[4] The record contains no evidence indicating that the father could have obtained the visa without traveling to Guatemala.[5] He *104 did not take the mother and the children with him because he could not afford it. The father expected he would be in Guatemala for 20 to 60 days. Because he realized he could not leave the children alone with the mother, the father arranged for the children to stay with a friend in Fort Payne while the mother remained in the family’s mobile home. The father also requested that the mother’s sisters and father check on the family while he was gone.
Within two weeks after the father arrived in Guatemala, the mother arranged with a friend to stay at the family’s mobile home to assist her with the children. The mother telephoned the father and requested his permission to obtain the children from the father’s friend’s home. The father agreed, on the condition that the mother’s friend live with her and the children. The mother thereafter obtained the children from the father’s friend’s home. However, the mother’s friend soon left the mobile home, leaving the mother largely unattended to care for the children, except when her sisters or father (“the children’s maternal grandfather”) would stop by to help her. The father testified that he had learned of the situation when he contacted the family on the telephone as he did every Wednesday night.[6] Upon learning of the situation, the father tried to speed up the visa process, but he was informed that instead of the expected 20 to 60 days, the process would take 6 to 9 months, during which time he could not legally return to the United States. The record contains no evidence indicating that any voluntary or intentional act or omission of the father prolonged the visa process.
While awaiting his visa, the father obtained a job in Guatemala working in a restaurant, earning $7 or $8 a day. He lived with friends in a home that had no running water. The mother sent him money from her SSI check to help him financially. The father testified that he believed that the mother could take cai’e of the children’s financial needs with food stamps and the remainder of her SSI check, although he admitted that the family had depended on his income while he was in Alabama to meet the children’s needs.
On September 13, 2006, DHR received a report that the mother had been found walking the street, crying and calling for help with the children.[7] DHR intervened at that point, and the mother worked out an arrangement with three persons, in addition to her sisters and her father, to assist her temporarily in caring for the children; however, each temporary plan failed. DHR informed the mother within a month of September 13, 2006, that the children would be placed in foster care if the father did not return expediently. According to a court report, DHR contacted the father over the telephone on several occasions to inform him of the situation. The father testified that he had requested that DHR forgo the removal of the children until he could obtain his visa. However, DHR ultimately decided that, because of the mother’s mental incapacity and the father’s absence, the children had *105 no one to properly care for them. On October 17, 2006, DHR filed a dependency petition and picked up the children.
Two days later the juvenile court held a shelter-care hearing and, by an order dated November 16, 2006, the juvenile court awarded DHR pendente lite custody of the children, who were subsequently placed into a foster home. The mother telephoned the father to let him know that DHR had taken the children.
After DHR placed the children in foster care, DHR arranged for medical screenings; those screenings showed the children to be healthy. DHR arranged for weekly visitation between the children and the mother and weekly telephone visitation between the children and both the mother and the father. DHR looked for relatives to take the children. One of the mother’s sisters indicated that she would be willing to accept custody of the children, but DHR would not approve that arrangement because of the sister’s and her husband’s criminal history. The sister testified that DHR additionally informed her that she had too many persons — herself, her husband, four teenage children, and her father — already living in her home.
On November 27, 2006, DHR submitted a court report indicating that it believed that it should be relieved of having to use reasonable efforts to reunite the family because the mother and the father had subjected the children to aggravating circumstances. DHR contended that the father had left the children with the mother while he traveled to Guatemala, even though he knew from his previous involvement with DHR that the mother’s mental condition precluded her from properly caring for the children, and it expressed concern to the court that he would continue to do so. On December 5, 2006, the juvenile court granted DHR’s request by entering an order finding that DHR had no duty to use reasonable efforts to reunite the family. DHR did not provide services to the family at any point after gaining custody of the children, but it concentrated on placing the children with an appropriate relative, the permanency plan adopted by the juvenile court on December 21, 2006.
On January 18, 2007, DHR filed a petition to terminate the parental rights of the mother and the father. Emma Ford, the DHR caseworker assigned to the family in 2006, testified that ordinarily DHR does not file termination petitions only three months after children have been placed in foster care, but her supervisor had told her to file the petition so soon because it was DHR’s position that the father had abandoned the children by staying in Guatemala. Ford testified that she had had several conversations with the father in which she had told him that he had to return to Alabama to avoid the termination of his parental rights and that each time the father had responded that he could not return until he obtained his visa. In early January 2007, the father delivered a notarized letter to Ford indicating that he was still trying to obtain his visa and that he had not abandoned his family.[8] The father requested that DHR maintain custody of the children until he could obtain his visa in approximately five months.[9] Ford testi *106 fied that she understood the only reason the father had not returned to Alabama as requested was because he was prohibited from doing so by Guatemalan and American law. Ford testified that she did not know whether, under those circumstances, the father had, in fact, abandoned the children.
Before the termination petition was filed, the children’s maternal grandfather had referred the mother to the family who had adopted her first child to see if they would accept custody of the children.[10] They would not agree to take the children, but they referred the mother to J.N. and M.N., who they knew from church and who had expressed an interest in adopting children. DHR did not agree to place the children with J.N. and M.N. because they lived in Kingston, Georgia. However, J.N. and M.N. met with the mother at the children’s maternal grandfather’s home on January 7, 2007, to obtain her consent to their adopting the children. On January 18, 2007, J.N. and M.N. filed a motion to intervene in the termination-of-parental-rights proceeding in order to protect their interests in adopting the children. J.N. and M.N. subsequently filed a petition to adopt the children in the Probate Court of DeKalb County on February 7, 2007, but they did not properly serve the father at that time.
On February 22, 2007, the juvenile court questioned the mother. The juvenile court found that the mother had consented to the transfer of the custody of the children to J.N. and M.N. and further that she had consented to the adoption of the children by them. The juvenile court concluded that the mother was mentally capable of understanding the ramifications of her consent. Based on the mother’s consent and a favorable home study, the juvenile court granted custody of the children to J.N. and M.N. and ordered DHR to close its file on the case. The judgment indicates that the father was not notified of that hearing, was not present at that hearing, and was not represented by counsel at that hearing. The mother’s former attorney testified that during the hearing the mother did not express any reservations about the adoption or ask the court to wait on the father before making its decision.[11]
The father eventually obtained a two-year visa that allowed him to return to the United States. He arrived back in Alabama on May 11, 2007. The father spoke with Ford when he returned about getting the children back. Ford informed him that DHR had closed its case file and that there was nothing she could do. Ford told the father to get an attorney. The record contains a document indicating that the father was served in the adoption proceeding on May 14, 2007. The father thereafter filed an objection to the adoption of the children, and the mother disavowed her earlier consent to the adoption and also objected to the adoption.[12] The probate *107 court granted a motion to transfer the adoption proceeding to the juvenile court on October 29, 2007. The juvenile court granted a motion to consolidate the adoption proceeding with the termination-of-parental-rights proceeding on November 6, 2007.
The father filed an answer on December 3, 2007, averring that he had not been served with the petition to terminate his parental rights.[13] The father admitted that he had left the country to obtain his visa, but he stated that he had returned with no expectations of leaving the mother and the children again. The father asked that custody of the children be immediately transferred back to him because he was a fit and proper person to raise the children.
The juvenile court conducted a hearing on January 31, 2008. At that hearing, the father testified that he had not abandoned the children but had left them temporarily solely to obtain a visa so he could securely live in this country without fear of deportation.[14] The father testified that he had not seen the children since July 31, 2006. He stated that he had been the children’s primary caregiver before leaving for Guatemala and that he wanted to resume that responsibility now that he had returned because he loved them. The father testified that he had never consented to the adoption of the children. At the time of the trial, the father had been working legally in Alabama for six to seven months, and he testified that he could provide for the children’s financial and other needs. He understood that he still could not leave the children alone with the mother, even though he believed that she could now properly parent them. He testified that, if he regained custody of the children, the family would move into a rental home and resume their prior family, educational, and medical routine.
The father testified that he would be eligible to apply for permanent citizenship one year after the date on which he had obtained his visa. The father expected that he would not encounter any problems obtaining his citizenship, but he admitted that if he did not do so, or if he violated the terms of his visa, he would have to leave the country. The father testified that he had no prepared plan for the children in the event he was deported. The father simply stated that he believed that the steps he and his immigration attorney had taken would allow him to gain his citizenship and remain in this country.
The mother testified that she had consented to the adoption of the children under pressure in February 2007 but that she had never consented on behalf of the father. After the father returned, she withdrew her consent, and she stated that, based on what she had learned in a parenting class she had recently passed, she believed that she could adequately assist the father in caring for the children. The mother further testified that the father had not abandoned the family and that she had always understood he was coming *108 back. The mother stated that the father was a good parent who loved the children.
Ford testified that all DHR’s recommendations and actions were based on the father’s absence from Alabama and the danger to the children in his absence. Ford testified further that, had the father returned within three or four months of leaving, DHR would have worked with him rather than filing a petition to terminate his parental rights. Ford stated that, if the juvenile court granted DHR custody of the children at the conclusion of the trial, DHR would work to reunite the children with the father and that DHR could provide services to the father to facilitate reunification. Ford admitted that DHR had no evidence indicating that the father had abused the children or had ever failed to support them while they were in his care. Ford also noted that, when the children were removed from the mother’s care in October 2006, the individualized service plan instituted at that time documented that the children appeared to be developmentally on target, were doing well in school, and were fairly well-behaved, although she stated that she did not verify the accuracy of those statements.
Ford testified that it would definitely not be in the best interests of the children to be in the sole custody of the mother. Ford further testified on direct examination as follows:
“[DHR’s counsel]: In your opinion, does it serve the best interest of these children for them to be returned to their father?
“[Ford]: My concern would be with the case being closed the last time and him being the primary caregiver, if he would make that same decision and leave once again, leaving the kids with her.
“Q: I’ll ask the question again.
“A: Okay.
“Q: Do you believe it would serve the best interest of the kids, given that — what has happened and what the father has done, do you think it would serve the best interest of the children for them to be returned to the father’s custody?
“A: I can’t answer that. I mean, because that would still be my concern, so, I guess no, since that is my concern.
“Q: Okay. Well, let me make sure we clarify the record.
“A: Okay.
“Q: You don’t — do you think it would be in the best interest of the kids to be returned to their father?
“[Mother’s counsel]: I object. That question has been now answered for the third time. She’s answered it twice.
“THE COURT: Sustain.
“Q: Do you think it would be in the best interest of the children to be returned to their mother?
“A: No, I don’t.
“Q: Given the past concerns and what has transpired in the case that you’ve been involved in with DHR, do you believe it would be in the best interest of the kids for them to be returned to the parents jointly?
“A: Maybe — that’s a hard question to answer because my concerns still remain with the dad and his choices.
“Q: [Mother’s counsel’s] head is going to come off if I ask that question again, but you haven’t answered it yet.
“[Mother’s counsel]: She’s answered it, obviously, to the best of her ability. “[DHR’s counsel]: I’m not sure that she has, but I will bait the objection.
“Q: Do you feel it’s in the best interest of these children to be returned to *109 the joint custody of their parents at this time?
“[Mother’s counsel]: Asked and answered. And I object to him badgering his own witness.
“[THE COURT]: Well, I’m trying to think what the answer was. She said that she — well, I guess she’s answered it, she doesn’t know. So sustain.”
Following this colloquy, Ford indicated that she would be concerned if the father was absent from the country again, leaving the mother as the children’s sole caregiver.
On cross-examination, Ford testified as follows:
“[Father’s counsel]: Is your opinion that you have reservations about returning back to the parent, is that not based on speculation that he may leave?
“A: That’s correct.
“Q: Something that’d occur in the future.
“A: Yes.
[[Image here]]
“Q: Now, at the time of making the recommendation not to return to the parents, that’s based upon the fact that he [the father] wasn’t here, correct?
“A: That’s correct.
“Q: Now that he’s back, does your opinion change?
“A: I can’t say one way or the other.”
M.N. and J.N. testified that they had met the children on January 7, 2007, at a visit supervised by DHR and that the mother had asked them at that visit if they would adopt the children. They assumed that the mother was speaking on behalf of the father as well as herself, but they both admitted that they had never obtained the father’s express consent to the adoption. J.N. testified that he and M.N. thought the father had abandoned the family because they had been led to believe, based on contacts with the mother and her family, that the father usually missed his weekly telephone calls. J.N. stated that he would not have taken custody of the children if he had known the father could possibly regain their custody when he returned from Guatemala. M.N. said that she “quite possibly” would not have assumed custody of the children if she had known the father was going to return from Guatemala. M.N. testified that the children did not ask for their father after they moved into M.N. and J.N.’s home, but she admitted that she had earlier told the home evaluator on January 20, 2007, that she knew that the children loved both parents and that they did not want to forget them. Nevertheless, she and J.N. agreed that the parents would have no contact with the children after they gained custody on February 22, 2007.
Dr. Fred Smoot, the Director of Emory Clergy Care, is a pastoral counselor who helps clergy families through life transitions via counseling and psychotherapy. Dr. Smoot recommended that the children be placed permanently with M.N., who is a pastor, and J.N. Dr. Smoot admitted that he had not met the parents, but he stated that he had reviewed the DHR records regarding their involvement with child-protective services. L.K., the woman who had adopted the mother’s first child, also testified for M.N. and J.N. She stated that the children had bloomed under their care and that she did not believe the mother and the father were good parents.
L.B., the mother’s sister, testified that the father had always enjoyed a good relationship with the children and that he can still properly care for them. L.B. testified that she knew that the father had left to obtain his visa, but she stated that he had always intended on returning; the only question in her mind had been when he *110 would return. L.B. testified that the mother could also properly care for the children with assistance and that the children’s custody should be returned to the parents. J.K., an employee of the DeKalb County Department of Health, testified that she had found the mother and the father to be incredibly serene and loving people who were very good and supportive parents. J.K. believed DHR had targeted the parents and had been harassing them for years. -
Following the hearing, the guardian ad litem for the children submitted a detailed report. The guardian ad litem found that the parents obviously loved the children, but that the father’s decision to leave the children with the mother while in Guatemala was “so seriously flawed, it raises questions concerning his ability to provide appropriate care for the children.” Based mainly on that premise, the guardian ad litem concluded that it was in the best interests of the children to terminate the father’s and the mother’s parental rights so that the children could be adopted by J.N. and M.N.
On March 5, 2008, the juvenile court entered judgments terminating the parental rights of the mother and the father and leaving custody of the children with J.N. and M.N. for the purposes of facilitating the adoption of the children by J.N. and M.N. The juvenile court also entered final judgments approving the adoption of the children by J.N. and M.N. The mother timely appealed the judgments on March 11, 2008. The father filed his notice of appeal on March 14, 2008.[15]

Issues

The father states three issues for appellate review; however, those issues may be compressed into two: (1) whether sufficient evidence supports a finding that there are grounds to terminate the father’s parental rights and (2) whether the juvenile court erred in finding that there was no viable alternative to terminating the father’s parental rights.

Grounds for Termination

Section 26-18-7, Ala.Code 1975, sets out the exclusive grounds for termination of parental rights:
“If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
Ala.Code 1975, § 26~18-7(a). That section further provides, in pertinent part:
“In any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a re-buttable presumption that the parents are unable or unwilling to act as parents.”
Ala.Code 1975, § 26-18-7(c). The father argues that the juvenile court concluded that he had abandoned the children based on an erroneous impression of the law and that the evidence did not disclose any other ground for terminating his parental rights.
During the trial of the case, as counsel for the mother was questioning why the DHR caseworker had filed a petition to terminate the parental rights of the father *111 when she had received a letter from the father indicating that he was precluded bylaw from returning to the United States, the juvenile court stated as follows:
“Here’s the situation we find ourselves in. If y’all want to continue with this hearing, we’ll move on to things that are relevant to do with whether or not these children were cared for by him or not. I cannot and do not wish to pass judgment on why he wasn’t here and if there was a good reason for it.
“The only question is: Was he here?
“We’ve established he wasn’t here, and the letter, if it says why he wasn’t here, it doesn’t really matter. There’s no excuse that we need to hear about. It’s just whether he was here or not.”
That statement reveals a misunderstanding of Alabama law.
The 1984 Child Protection Act (“the CPA”), Ala.Code 1975, § 26-18-1 et seq., controls the law governing termination-of-parental-rights cases and defines abandonment as
“[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.”
Ala.Code 1975, § 26-18-3(1). In Ex -parte F.P., 857 So.2d 125, 138 (Ala.2003), our supreme court stated that “[t]he definition of abandonment in § 26-18-3(1) ... recognizes excuse as a basis on which to avoid abandonment.” See also L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (“Abandonment implies an intentional act on the part of the parent.”). Therefore, if the father was, in fact, unintentionally, involuntarily, or justifiably prevented from interacting with the children as a parent, then his conduct cannot be considered abandonment. Hence, the reason for his continued absence from the children as well any evidence bearing on that reason was clearly relevant to a determination of whether the father had abandoned the children.[16]
In its final judgment, the juvenile court found that the father had been voluntarily and intentionally absent from this country for nine months.[17] A juvenile court’s factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. Id. “Clear and convincing evidence” is
“ ‘[e]vidence that, when weighed against evidence in opposition, will produce in *112 the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.’ ”
L.M. v. D.D.F., 840 So.2d at 179 (quoting Ala.Code 1975, § 6-ll-20(b)(4)).
“ ‘[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly ... establish the fact sought to be proved.’ ”
Ex parte McInish, [Ms. 1060600, Sept. 5, 2008] — So.3d -, - (Ala.2008) (quoting KGS Steel, Inc. v. McInish, [Ms. 2040526, June 30, 2006] - So.3d -, -(Ala.Civ.App.2006) (Murdock, J., concurring in the result)).
Although it is undisputed that the father was absent from this country from July 31, 2006, to May 11, 2007, the record contains no evidence, much less clear and convincing evidence, indicating that the father was voluntarily and intentionally absent from the children during that period. The record shows that the father was compelled to travel to Guatemala in order to obtain his visa; that he intended to return as soon as he obtained his visa, which he believed would take only 20 to 60 days; and that the visa-application process actually extended to 9 months, during which time the father could not legally travel back to the United States. DHR presented no evidence indicating that the father’s voluntary or intentional conduct caused a delay in his obtaining the visa.
The record further shows that, during the time he was in Guatemala, the father maintained contact with the children through weekly telephone calls.[18] Even after DHR received custody of the children, the father continued his weekly telephone visitation with the children. The father did not contact the children after February 22, 2007, because the juvenile court had given custody of the children to J.N. and M.N., who refused to allow the father or the mother to communicate with the children.
While living in Guatemala, the father did not send money to support the children, as the juvenile court also found; however, the father testified that he was working for $7 to $8 a day while living in Guatemala because of the poor economic conditions in that country. “[P]overty alone is not enough to warrant the termination of parental rights.” C.B. v. State Dep’t of Human Res., 782 So.2d 781, 785 (Ala.Civ. App.1998). Moreover, the CPA provides that a failure to provide for the child’s material needs or to pay a reasonable portion of the child’s support is relevant only “where the parent is able to do so.” Ala. Code 1975, § 26 — 18—7(b)(1). Additionally, DHR actually entered a court report dated December 21, 2006, into the record indicat *113 ing that it was not requesting child support from the father. The juvenile court never ordered the father to pay any child support to DHR or to J.N. and M.N., so there was no “failure” to pay child support.
Obviously, because of his inability to return to the United States, the father was unable to physically care for the children as a present parent could; however, the record is devoid of any evidence indicating that the father intentionally withheld his presence from the children. Legal and economic realities restrained the father from being able to act as a parent toward the children from July 31, 2006, to May 11, 2007.
In her dissent, Judge Thomas equates the facts of this case with those in J.L. v. State Department of Human Resources, 961 So.2d 839 (Ala.Civ.App.2007). 12 So.3d at 119 (Thomas, J., dissenting). In J.L., the parent committed voluntary criminal actions that he knew would result in his extended incarceration if he was caught and convicted. In this case, the father left for Guatemala with the expectation that he would be gone for no longer than two months. He did not know upon embarking that the visa process would take an additional seven months, and he did not commit any intentional or voluntary act that led to the delay. The facts of this case are decidedly distinguishable from the facts in J.L.
In J.L., the court did state that the juvenile court may consider “all the circumstances of the case, including the father’s actions that led to his separation from the child.” 961 So.2d at 849. In this case, considering all the circumstances, including the reason the father separated from the children, the arrangements he had made for their care before leaving, the circumstances arising after he arrived in Guatemala, his multiple contacts with DHR explaining his situation, and his consistent statements that he wanted to maintain his family, we conclude that the evidence is insufficient to place in the mind of a reasonable trier of fact a clear conviction that the father had abandoned the children by staying in Guatemala. The juvenile court therefore erred in finding that the father had abandoned the children during the period he was in Guatemala.
Because there is no clear and convincing evidence of abandonment during the four months preceding the filing of the petition, § 26-18-7(c) does not apply to create a presumption that the father was unable or unwilling to discharge his parental responsibilities to and for the children. The judgment terminating the father’s parental rights cannot rest on that presumption, but, if it is to be affirmed, it must rest on other clear and convincing evidence demonstrating the statutory grounds for termination.
“This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.”
D.O. v. Calhoun County Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App. 2003). The evidence in the record indicates that, at the time of the trial, the father was living in a proper home, was earning enough money to properly care for the children, and had expressed his intent to resume his role as the primary caregiver for the children. In their dissents, neither Judge Thomas[19] nor Judge Bryan *114 assert that the record contaras clear and convincing evidence indicating that, at the time of the trial, the father was unable or unwilling to discharge his parental responsibilities to and for the children or that his conduct or condition was such as to render him unable to properly care for the children. It is true that the father’s visa will terminate two years after it was issued,[20] but, as the DHR representative herself admitted, it would be totally speculative to terminate his parental rights on the basis that at the end of that two-year period the father may have to leave the country without the children.
At trial, the DHR caseworker candidly admitted that she “could not say one way or the other” whether the children should be returned to the custody of the father. As noted, the burden of proof on DHR is to establish one of the statutory grounds for termination by clear and convincing evidence. See Ala.Code 1975, § 26-18-7(a). DHR did not meet that burden, admitting that it could not even determine that the children should not be returned to the custody of the father.
The only evidence remotely supporting a termination of the father’s parental rights is the evidence indicating that the mother was left to care for the children while the father was in Guatemala. However, the evidence is undisputed that the father did not leave the children with the mother. He left the children with a friend with instructions to the mother’s family to check on them. DHR presented no evidence indicating that the friend was an improper or unfit person to receive and care for the children or that the father’s plan was unreasonable. After the father was already in Guatemala, the mother made alternative arrangements to care for the children with her friend. That plan did not work out, and the mother ended up caring for the children alone. As the father testified, however, because he was not allowed to return to the United States, he could not care for the children himself and his and the mother’s reliance on their friends turned out to be misplaced. Thus, in his letter to DHR in January 2007, he requested that the children remain in DHR’s custody until he could return. That evidence does not constitute clear and convincing evidence supporting either of the statutory grounds for termination.
Parents and children have a fundamental right to maintain their relationship that does not evaporate simply because the parents “have not been model parents or have lost temporary custody of their child[ren].” Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). “The termination of parental rights is an extreme matter and is not to be considered lightly.” S.M.W. v. J.M.C., 679 So.2d 256, 258 (Ala.Civ.App.1996). “Inasmuch as the termination of parental rights strikes at the very heart of the family unit, a court should terminate parental rights only in the most egregious of circumstances.” Exparte Beasley, 564 So.2d 950, 952 (Ala. 1990). The record does not support the juvenile court’s conclusion that the circumstances in this case were so egregious that *115 termination of the father’s parental rights was appropriate.

Viable Alternatives

The father also argues that the juvenile court erred in finding that there was no viable alternative to terminating his parental rights. Parents and their children share a liberty interest in continued association with one another, i.e., a fundamental right to family integrity. Santosky v. Kramer, supra. A state may only interfere with that right to achieve a compelling governmental objective using the most narrowly tailored means available. Roe v. Conn, 417 F.Supp. 769 (M.D.Ala.1976). Accordingly, parental rights may be terminated only when “less drastic measures would be unavailing.” 417 F.Supp. at 779. Under Alabama law, a juvenile court may terminate parental rights only when no viable alternative exists. Beasley, supra. Stated conversely, if a viable alternative exists to achieve the compelling governmental objective at stake, a juvenile court may not terminate parental rights.
The Alabama Legislature has incorporated the “viable alternatives” concept into the Juvenile Code by specifically requiring juvenile courts to use reasonable efforts to reunite separated families. Ala.Code 1975, § 12-15-65(m). The legislature has further recognized the viable-alternative principles by authorizing juvenile courts to make custodial dispositions to protect children while reasonable efforts at family reunification are undertaken. Ala.Code 1975, § 12-15-71. One statutory alternative allows a juvenile court to place a child in the custody of DHR until any barriers to family reunification are removed. See Ala.Code 1975, § 12-15-71(a)(3)a. DHR, in turn, may place a child into foster care; however, it is the policy of this state, in keeping with the federal guidelines established in the Adoption and Safe Families Act, Pub.L. No. 105-89, 111 Stat. 2115 (1997), codified at 42 U.S.C. §§ 671 and 675, that children should not spend prolonged periods in foster care awaiting family reunification. See M.A.J. v. S.F., 994 So.2d 280, 291 (Ala.Civ.App.2008). This court recently recognized that “when DHR timely exerts reasonable rehabilitation and reunification efforts, the parents generally shall have 12 months from the date the child enters foster care to prove that their conduct, condition, or circumstances have improved so that reunification may be promptly achieved.” 994 So.2d at 291.
As an exception to the general goal of family reunification, if a parent has subjected a child to certain statutory “aggravating circumstances,” juvenile courts have no duty to use reasonable efforts to reunite the family. See Ala.Code 1975, § 12-15-65(m)(l). In those cases, reasonable efforts are directed not toward parental rehabilitation and family reunification, but to the prompt permanent disposition of the custody of the child. See Ala.Code 1975, § 12-15-65(m).
Applying the foregoing general principles to this case, once the children were separated completely from their parents on October 17, 2006, the juvenile court had a duty to use reasonable efforts to reunite the family unless the parents had subjected the children to “aggravating circumstances.” The only “aggravating circumstance” alleged in this ease is the father’s abandonment of the children while he was in Guatemala. See Ala. Code 1975, § 12-15-65(m)(l) (listing abandonment as aggravating circumstance). As decided above, the record does not contain clear and convincing evidence to support a finding of abandonment, so the general duty to use reasonable efforts to reunite the family remained. The juvenile court thus erred in entering its December 5, 2006, order *116 relieving DHR of its duty to use reasonable efforts to reunite the family.
As Ford testified, once the juvenile court ruled that the father had abandoned the children, DHR almost immediately adopted a plan to file a petition to terminate the father’s parental rights. Ford testified that she informed the father that the petition would be filed if he did not return to Alabama as soon as possible. He responded by, among other things, faxing a notarized letter to her in early January 2007 indicating that he was legally restrained from returning to the United States for another five months. Despite DHR’s full knowledge of the father’s predicament and his expected return date,[21] DHR nevertheless proceeded with the filing of the petition to terminate parental rights.
In his dissent, Judge Bryan basically argues that DHR had no alternative but to file a petition to terminate the father’s parental rights due to his prolonged absence. 12 So.3d at 117 (Bryan, J., dissenting). We respectfully disagree. The children could have remained in foster care until May 2007 when the father actually returned, which was a full month before his expected return date. After all, the main purpose of foster care is to secure the children temporarily until the family can be safely reunited. See K.W. v. J.G., 856 So.2d 859, 873 (Ala.Civ.App.2003). Although that alternative would have meant that the children would have had to spend up to six months in foster care, under the circumstances of this case that six-month stay would not have been unreasonable. That placement would have been half the presumptively reasonable one-year period given to most parents. More importantly, at the end of the six months, the sole identified barrier to reunification was certainly going to be removed when the father obtained his visa and returned to this country.[22]
As we explained in M.A.J., supra, the Alabama Juvenile Justice Act (“the AJJA”), Ala.Code 1975, § 12-15-1 et seq., does not forbid lengthy stays in foster care, even placements exceeding a year; it only requires juvenile courts to use reasonable efforts to end foster-care placement in favor of a permanent placement when a parent is not making reasonable efforts to rehabilitate himself or herself or when reasonable efforts at family reunification are not required, have failed, or would be futile. 994 So.2d at 291. DHR presented no evidence indicating that the father was not diligently attempting to obtain his visa and return to the United States to reunite with his family or that his obtaining the visa would not facilitate family reunification. In the absence of such evidence, continuation of foster care until the father’s expected return date remained a viable alternative to termination of his parental rights.
A juvenile court should direct its efforts toward placing children permanently outside the family home only after the point when it becomes clear that the family cannot be reunited safely within the time frames established by the AJJA.[23] Until *117 that point, the AJJA is clear that family reunification is the preferred goal and that reasonable efforts should be directed toward that goal. See Ala.Code 1975, § 12-15-1.1 and § 12-15-65(m) (“If continuation of reasonable efforts is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made to place the child and to complete whatever steps are necessary to finalize the permanent placement of the child.”). In this case, however, the juvenile court granted J.N. and M.N. permanent custody of the children and ordered DHR to close its file in February 2007, when family reunification remained viable.
At trial, Ford testified that DHR could have provided the father services in order to reunite him with the children. However, relying on both the order relieving it of a duty to use reasonable reunification efforts and the order to close its file, DHR did not make any attempt to assist the father with reuniting with the children after his return. ' It is apparent that family reunification could have been achieved within the statutorily prescribed time frame but for the erroneous rulings of the juvenile court.
Based on the foregoing, we reverse the judgment of the juvenile court terminating the parental rights of the father. We remand the case for further proceedings consistent with this opinion. We note that the judgments approving the adoption of the children relied. in part on the judgment terminating the parental rights of the father. Because we are reversing the judgment terminating the parental rights of the father, the juvenile court shall on remand reconsider the validity of the judgments approving adoption of the children in light of our conclusion.
APPLICATION OVERRULED; OPINION OF NOVEMBER 7, 2008, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
PITTMAN, J., concurs.
THOMPSON, P.J., concurs in the result, without writing.
BRYAN and THOMAS, JJ., dissent, with writings.

. The evidence consists not only of the testimony and exhibits introduced in the January 31, 2008, hearing, but also of all the court reports introduced into evidence since 2001. Although the father objected to the introduction of those court reports on hearsay *103 grounds and on the ground that the father had not been given an opportunity to object to those records, the juvenile court overruled that objection. See Ex parte State Dep’t of Human Res., 890 So.2d 114, 118 (Ala.2004) (holding that "trial court could take judicial notice of the contents of the court files to the extent it considered previous court orders, evidence admissible under an exception to the hearsay rule, and testimony and evidence admitted at any previous adjudicatory proceedings such as when the children were determined to be dependent”). On appeal, the father has not raised any issue regarding the juvenile court’s evidentiary ruling.

. A.B. was bom on October 7, 1999, and Ju.B. was born on April 6, 2001.

. Emma Ford, the DHR representative, testified that in providing services for the family and in making decisions regarding the welfare of the children the father’s illegal-immigrant status was immaterial to DHR.

. Despite Judge Thomas's contention that the father "suddenly decided” to leave the country, 12 So.3d at 120 (Thomas, J., dissenting), the record contains no evidence regarding the circumstances that motivated the father to travel to Guatemala to obtain a visa in 2006.

. During questioning, DHR asked the father if it was true whether he could have obtained his visa in the United States; the father stated, through an interpreter, "That’s exactly why [I] went to take care of it, and they gave [me] a visa to come back to this country.” The answer was nonresponsive to the question, but DHR did not question the father further on the point. As a result, there is no evidence indicating that the father could have obtained the visa within the United States, as Judge Thomas’s dissent suggests. 12 So.3d at 119-22 (Thomas, J., dissenting).

. Judge Thomas claims that, after learning of the situation, the father took no action to assure that the mother was not parenting the children alone. 12 So.3d at 119 (Thomas, J., dissenting). As set out later in the main opinion, the father testified that he tried to expedite the visa process and that he eventually asked DHR to maintain custody of the children until he could return. The father testified that he could do nothing further due to his absence from the country.

. The mother’s sister denied that the mother took to the streets for help, but she admitted that the mother did request help with the children.

. Although the father’s signature to the letter was notarized, Ford testified that she believed that someone else had written the letter. As Judge Thomas maintains, in the letter the father acknowledges an upcoming hearing regarding custody of the children, 12 So.3d at 119 (Thomas, J., dissenting); however, her dissent omits the fact that the father indicated that he could not attend that hearing due to his legal inability to return to the United States without a visa.

. That evidence totally contradicts Judge Bryan’s assertion that the father failed to provide DHR with his expected return date and *106 that "DHR could have had no reasonable expectation that the father would be returning to this country within the near future” when it filed its petition to terminate parental rights. 12 So.3d at 117 (Bryan, J., dissenting).

.The mother lost custody of her first child in 1995 following a finding by DHR that she had physically abused that child. The child’s maternal grandfather originally had obtained custody of that child, but he had later consented to her being adopted by another family.

. It is undisputed that the father had notified DHR repeatedly over the telephone and once in writing that he did not want to lose custody of the children.

. Although the court file from the adoption proceeding was supposed to be incorporated into the juvenile court's record, the juvenile court's record does not contain the father's objection or the mother's notice of withdraw *107 al of her consent. In their motion to consolidate, which was filed in the juvenile court on October 25, 2007, J.N. and M.N. averred that, since the entry of the February 22, 2007, custody order, "the father returned from the foreign country of his citizenship and registered his objection to adoption proceedings in the Probate Court,” indicating a close proximity between those two events.

. The record contains no document indicating that the father had been served in the termination-of-parental-rights proceeding. The record does contain a document indicating that the father was served in the adoption proceeding, but the father also denied that he had received service in that proceeding.

. Because of his poor English, the father testified through an interpreter.

. This appeal concerns only the judgment terminating the father’s parental rights.

. In his dissent, Judge Bryan notes that the father was absent from his children for a total of 284 days while he was in Guatemala. 12 So.3d at 117 (Bryan, J., dissenting). Judge Bryan argues that, when coupled with a lack of a definitive return date, the father's prolonged absence justified a termination of his parental rights. Based on that reasoning, any parent who is absent from the family home for an extended period of time without a specified return date due to reasons beyond his or her control could be subject to termination of his or her parental rights. We decline to adopt such a rule that would equate any indefinite prolonged absence with abandonment.

. The juvenile court did not find that the father had continued to abandon the children after his return from Guatemala.

. In her dissent, Judge Thomas points out J.N.’s testimony that he and M.N. were "led to believe that the father's contact with the family was ‘minimal’ and that the father usually missed scheduled telephone calls." 12 So.3d at 122 (Thomas, J., dissenting). The record contains no evidence of who made the statements upon which J.N. and M.N. formed their belief and whether that person had any personal knowledge regarding the matter. The record contains no direct evidence indicating that the father ever missed any telephone visitation with the children. At any rate, a "belief” not based on personal knowledge is hardly clear and convincing evidence that proves a fact. That J.N.’s testimony was admitted without objection does not transform it into clear and convincing evidence.

. Judge Thomas points out that the father was driving without a license, 12 So.3d at 121 (Thomas, J., dissenting); however, that same circumstance existed in 2003 when the juve *114 nile court returned custody of the children to the father. The mere absence of a driver’s license does not impede the father from properly raising his children. Judge Thomas does not point to any other evidence regarding the father's current conditions that proves that the father is unable to properly parent the children.

. In her dissent. Judge Thomas partially relies on Ford's testimony that “her primary concern was that the father had left the children with the mother and had returned to Guatemala and that this might occur again.” 12 So.3d at 121 (Thomas, J., dissenting). That testimony is speculative at best.

. See n. 9, infra.

. No witness testified that the father needed to do anything other than obtain his visa and return to Alabama in order to reunite with the children.

. In his dissent, Judge Bryan argues that the main opinion is in error for "[fjocusing solely on a parent's 'good-faith' efforts while giving no consideration to the children's need for permanency and stability_” 12 So.3d at 119 (Bryan, J., dissenting). The statutory framework requires juvenile courts to first concentrate its efforts on family reunification, see Ala.Code 1975, § 12-15-65(m), which includes the parent's good-faith efforts to overcome barriers to reunification. See D.M.P. v. State Dep't of Human Res., 871 So.2d 77 *117 (Ala.Civ.App.2003) (Murdock, J., joined by Crawley, J., with Yates, P.J., and Thompson and Pittman, JJ., concurring in the result). In focusing on family reunification, however, the court does not ignore the child’s need for permanency and stability. If the goal of family reunification is met, the child's need for permanency and stability is likewise satisfied in the manner traditionally recognized as the most natural and appealing — through parental custody. Furthermore, in focusing first on family reunification, the court is giving due consideration to the child's fundamental constitutional right to family integrity, which remains an uppermost concern for the child as well as for the parent until the point when clear and convincing evidence establishes that family reunification cannot be achieved. See Santosky, supra.