MOORE, Judge.
T.B. (“the mother”) appeals from a judgment of the DeKalb Juvenile Court (“the juvenile court”) terminating her parental rights to her two natural children and from judgments of the juvenile court approving the adoption of the children. We reverse and remand.

Facts

This is a companion case to J.B. v. DeKalb County Department of Human Resources, 12 So.3d 100 (Ala.Civ.App.2008), *92 in which this court reversed a judgment terminating the father’s parental rights to the same children at issue in this case. The facts in this case are identical to those in J.B., which we set out below:
“In July 2001, the DeKalb County Department of Human Resources (‘DHR’) opened a protective-services case regarding A.B. and Ju.B., the children born of the marriage between the father and T.B. (‘the mother’). DHR received reports that the father was in jail serving 40 days for a conviction of driving under the influence and that the mother was not properly caring for the medical and hygiene needs of the children. DHR attempted to teach the mother parenting and housekeeping skills; however, the mother did not seem to be able to learn. DHR then petitioned the juvenile court to obtain custody of the children, which petition was granted in October 2001. Subsequently, a psychological evaluation showed that the mother had an IQ of 58 and that she could not properly parent the children because of her mental deficiencies. However, DHR and the juvenile court determined that the father was capable of caring for the children. DHR eventually worked out a plan pursuant to which the children could be placed in day care until the end of the father’s workday, after which he would take over their primary care. In December 2002, the juvenile court returned physical custody of the children to the parents based on that plan. On September 29, 2003, the parents obtained full physical and legal custody of the children. Although the September 29, 2003, judgment did not place any limitations on the mother’s custodial authority, DHR and the father understood that the mother would not be left alone to care for the children.
“DHR had no further involvement with the family between September 2003 and 2006. During that time, the father worked at a series of three jobs while the children stayed in day care and he acted as the primary caregiver for the children when he was not working. The mother assisted the father with child care, but mainly she kept house; the mother did not work because of her mental disability, and she received a monthly Supplement Security Income (‘SSI’) check from the Social Security Administration.
“On July 31, 2006, the father, who was an illegal immigrant, returned to his native country of Guatemala to obtain a visa so he could legally reside in the United States. The record contains no evidence indicating that the father could have obtained the visa without traveling to Guatemala. He did not take the mother and the children with him because he could not afford it. The father expected he would be in Guatemala for 20 to 60 days. Because he realized he could not leave the children alone with the mother, the father arranged for the children to stay with a friend in Fort Payne while the mother remained in the family’s mobile home. The father also requested that the mother’s sisters and father check on the family while he was gone.
“Within two weeks after the father arrived in Guatemala, the mother arranged with a friend to stay at the family’s mobile home to assist her with the children. The mother telephoned the father and requested his permission to obtain the children from the father’s friend’s home. The father agreed, on the condition that the mother’s friend live with her and the children. The mother thereafter obtained the children from the father’s friend’s home. However, the mother’s friend soon left the *93 mobile home, leaving the mother largely unattended to care for the children, except when her sisters or father (‘the children’s maternal grandfather’) would stop by to help her. The father testified that he had learned of the situation when he contacted the family on the telephone as he did every Wednesday night. Upon learning of the situation, the father tried to speed up the visa process, but he was informed that instead of the expected 20 to 60 days, the process would take 6 to 9 months, during which time he could not legally return to the United States. The record contains no evidence indicating that any voluntary or intentional act or omission of the father prolonged the visa process.
“While awaiting his visa, the father obtained a job in Guatemala working in a restaurant, earning $7 or $8 a day. He lived with friends in a home that had no running water. The mother sent him money from her SSI check to help him financially. The father testified that he believed that the mother could take care of the children’s financial needs with food stamps and the remainder of her SSI check, although he admitted that the family had depended on his income while he was in Alabama to meet the children’s needs.
“On September 13, 2006, DHR received a report that the mother had been found walking the street, crying and calling for help with the children. DHR intervened at that point, and the mother worked out an arrangement with three persons, in addition to her sisters and her father, to assist her temporarily in caring for the children; however, each temporary plan failed. DHR informed the mother within a month of September 18, 2006, that the children would be placed in foster care if the father did not return expediently. According to a court report, DHR contacted the father over the telephone on several occasions to inform him of the situation. The father testified that he had requested that DHR forgo the removal of the children until he could obtain his visa. However, DHR ultimately decided that, because of the mother’s mental incapacity and the father’s absence, the children had no one to properly care for them. On October 17, 2006, DHR filed a dependency petition and picked up the children.
“Two days later the juvenile court held a shelter-care hearing and, by an order dated November 16, 2006, the juvenile court awarded DHR pendente lite custody of the children, who were subsequently placed into a foster home. The mother telephoned the father to let him know that DHR had taken the children.
“After DHR placed the children in foster care, DHR arranged for medical screenings; those screenings showed the children to be healthy. DHR arranged for weekly visitation between the children and the mother and weekly telephone visitation between the children and both the mother and the father. DHR looked for relatives to take the children. One of the mother’s sisters indicated that she would be willing to accept custody of the children, but DHR would not approve that arrangement because of the sister’s and her husband’s criminal history. The sister testified that DHR additionally informed her that she had too many persons — herself, her husband, four teenage children, and her father — already living in her home.
“On November 27, 2006, DHR submitted a court report indicating that it believed that it should be relieved of having to use reasonable efforts to reunite the family because the mother and the father had subjected the children to aggravating circumstances. DHR con *94 tended that the father had left the children with the mother while he traveled to Guatemala, even though he knew from his previous involvement with DHR that the mother’s mental condition precluded her from properly caring for the children, and it expressed concern to the court that he would continue to do so. On December 5, 2006, the juvenile court granted DHR’s request by entering an order finding that DHR had no duty to use reasonable efforts to reunite the family. DHR did not provide services to the family at any point after gaining custody of the children, but it concentrated on placing the children with an appropriate relative, the permanency plan adopted by the juvenile court on December 21, 2006.
“On January 18, 2007, DHR filed a petition to terminate the parental rights of the mother and the father. Emma Ford, the DHR caseworker assigned to the family in 2006, testified that ordinarily DHR does not file termination petitions only three months after children have been placed in foster care, but her supervisor had told her to file the petition so soon because it was DHR’s position that the father had abandoned the children by staying in Guatemala. Ford testified that she had had several conversations with the father in which she had told him that he had to return to Alabama to avoid the termination of his parental rights and that each time the father had responded that he could not return until he obtained his visa. In early January 2007, the father delivered a notarized letter to Ford indicating that he was still trying to obtain his visa and that he had not abandoned his family. The father requested that DHR maintain custody of the children until he could obtain his visa in approximately five months. Ford testified that she understood the only reason the father had not returned to Alabama as requested was because he was prohibited from doing so by Guatemalan and American law. Ford testified that she did not know whether, under those circumstances, the father had, in fact, abandoned the children.
“Before the termination petition was filed, the children’s maternal grandfather had referred the mother to the family who had adopted her first child to see if they would accept custody of the children. They would not agree to take the children, but they referred the mother to J.N. and M.N., who they knew from church and who had expressed an interest in adopting children. DHR did not agree to place the children ■with J.N. and M.N. because they lived in Kingston, Georgia. However, J.N. and M.N. met with the mother at the children’s maternal grandfather’s home on January 7, 2007, to obtain her consent to their adopting the children. On January 18, 2007, J.N. and M.N. filed a motion to intervene in the termination-of-parental-rights proceeding in order to protect their interests in adopting the children. J.N. and M.N. subsequently filed a petition to adopt the children in the Probate Court of DeKalb County on February 7, 2007, but they did not properly serve the father at that time.
“On February 22, 2007, the juvenile court questioned the mother. The juvenile court found that the mother had consented to the transfer of the custody of the children to J.N. and M.N. and further that she had consented to the adoption of the children by them. The juvenile court concluded that the mother was mentally capable of understanding the ramifications of her consent. Based on the mother’s consent and a favorable home study, the juvenile court granted custody of the children to J.N. and M.N. *95 and ordered DHR to close its file on the case. The judgment indicates that the father was not notified of that hearing, was not present at that hearing, and was not represented by counsel at that hearing. The mother’s former attorney testified that during the hearing the mother did not express any reservations about the adoption or ask the court to wait on the father before making its decision.
“The father eventually obtained a two-year visa that allowed him to return to the United States. He arrived back in Alabama on May 11, 2007. The father spoke with Ford when he returned about getting the children back. Ford informed him that DHR had closed its case file and that there was nothing she could do. Ford told the father to get an attorney. The record contains a document indicating that the father was served in the adoption proceeding on May 14, 2007. The father thereafter filed an objection to the adoption of the children, and the mother disavowed her earlier consent to the adoption and also objected to the adoption. The probate court granted a motion to transfer the adoption proceeding to the juvenile court on October 29, 2007. The juvenile court granted a motion to consolidate the adoption proceeding with the termination-of-parental-rights proceeding on November 6, 2007.
“The father filed an answer on December 3, 2007, averring that he had not been served with the petition to terminate his parental rights. The father admitted that he had left the country to obtain his visa, but he stated that he had returned with no expectations of leaving the mother and the children again. The father asked that custody of the children be immediately transferred back to him because he was a fit and proper person to raise the children.
“The juvenile court conducted a hearing on January 31, 2008. At that hearing, the father testified that he had not abandoned the children but had left them temporarily solely to obtain a visa so he could securely live in this country without fear of deportation. The father testified that he had not seen the children since July 31, 2006. He stated that he had been the children’s primary caregiver before leaving for Guatemala and that he wanted to resume that responsibility now that he had returned because he loved them. The father testified that he had never consented to the adoption of the children. At the time of the trial, the father had been working legally in Alabama for six to seven months, and he testified that he could provide for the children’s financial and other needs. He understood that he still could not leave the children alone with the mother, even though he believed that she could now properly parent them. He testified that, if he regained custody of the children, the family would move into a rental home and resume their prior family, educational, and medical routine.
“The father testified that he would be eligible to apply for permanent citizenship one year after the date on which he had obtained his visa. The father expected that he would not encounter any problems obtaining his citizenship, but he admitted that if he did not do so, or if he violated the terms of his visa, he would have to leave the country. The father testified that he had no prepared plan for the children in the event he was deported. The father simply stated that he believed that the steps he and his immigration attorney had taken would allow him to gain his citizenship and remain in this country.
“The mother testified that she had consented to the adoption of the children *96 under pressure in February 2007 but that she had never consented on behalf of the father. After the father returned, she withdrew her consent, and she stated that, based on what she had learned in a parenting class she had recently passed, she believed that she could adequately assist the father in caring for the children. The mother further testified that the father had not abandoned the family and that she had always understood he was coming back. The mother stated that the father was a good parent who loved the children.
“Ford testified that all DHR’s recommendations and actions were based on the father’s absence from Alabama and the danger to the children in his absence. Ford testified further that, had the father returned within three or four months of leaving, DHR would have worked with him rather than filing a petition to terminate his parental rights. Ford stated that, if the juvenile court granted DHR custody of the children at the conclusion of the trial, DHR would work to reunite the children with the father and that DHR could provide services to the father to facilitate reunification. Ford admitted that DHR had no evidence indicating that the father had abused the children or had ever failed to support them while they were in his care. Ford also noted that, when the children were removed from the mother’s care in October 2006, the individualized service plan instituted at that time documented that the children appeared to be developmental^ on target, were doing well in school, and were fairly well-behaved, although she stated that she did not verify the accuracy of those statements.
“Ford testified that it would definitely not be in the best interests of the children to be in the sole custody of the mother. Ford further testified on direct examination as follows:
“ ‘[DHR’s counsel]: In your opinion, does it serve the best interest of these children for them to be returned to their father?
“ ‘[Ford]: My concern would be with the case being closed the last time and him being the primary caregiver, if he would make that same decision and leave once again, leaving the kids with her.
“ ‘Q: I’ll ask the question again.
“ ‘A: Okay.
“ ‘Q: Do you believe it would serve the best interest of the kids, given that — what has happened and what the father has done, do you think it would serve the best interest of the children for them to be returned to the father’s custody?
“ A: I can’t answer that. I mean, because that would still be my concern, so, I guess no, since that is my concern.
“ ‘Q: Okay. Well, let me make sure we clarify the record.
“A: Okay.
“ ‘Q: You don’t — do you think it would be in the best interest of the kids to be returned to their father?
“ ‘[Mother’s counsel]: I object. That question has been now answered for the third time. She’s answered it twice.
“ ‘THE COURT: Sustain.
“ ‘Q: Do you think it would be in the best interest of the children to be returned to their mother?
“A: No, I don’t.
“ ‘Q: Given the past concerns and what has transpired in the case that you’ve been involved in with DHR, do you believe it would be in the best *97 interest of the kids for them to be returned to the parents jointly?
“‘A: Maybe — that’s a hard question to answer because my concerns still remain with the dad and his choices.
“ ‘Q: [Mother’s counsel’s] head is going to come off if I ask that question again, but you haven’t answered it yet.
“ ‘[Mother’s counsel]: She’s answered it, obviously, to the best of her ability.
“ ‘[DHR’s counsel]: I’m not sure that she has, but I will bait the objection.
“ ‘Q: Do you feel it’s in the best interest of these children to be returned to the joint custody of their parents at this time?
“ ‘[Mother’s counsel]: Asked and answered. And I object to him badgering his own witness.
“ ‘[THE COURT]: Well, I’m trying to think what the answer was. She said that she — well, I guess she’s answered it, she doesn’t know. So sustain.’
“Following this colloquy, Ford indicated that she would be concerned if the father was absent from the country again, leaving the mother as the children’s sole caregiver.
“On cross-examination, Ford testified as follows:
“ ‘[Father’s counsel]: Is your opinion that you have reservations about returning back to the parent, is that not based on speculation that he may leave?
“ ‘A: That’s correct.
“ ‘Q: Something that’d occur in the future.
“‘A: Yes.
[[Image here]]
“ ‘Q: Now, at the time of making the recommendation not to return to the parents, that’s based upon the fact that he [the father] wasn’t here, correct?
“ ‘A: That’s correct.
“ ‘Q: Now that he’s back, does your opinion change?
“ ‘A: I can’t say one way or the other.’
“M.N. and J.N. testified that they had met the children on January 7, 2007, at a visit supervised by DHR and that the mother had asked them at that visit if they would adopt the children. They assumed that the mother was speaking on behalf of the father as well as herself, but they both admitted that they had never obtained the father’s express consent to the adoption. J.N. testified that he and M.N. thought the father had abandoned the family because they had been led to believe, based on contacts with the mother and her family, that the father usually missed his weekly telephone calls. J.N. stated that he would not have taken custody of the children if he had known the father could possibly regain their custody when he returned from Guatemala. M.N. said that she ‘quite possibly’ would not have assumed custody of the children if she had known the father was going to return from Guatemala. M.N. testified that the children did not ask for their father after they moved into M.N. and J.N.’s home, but she admitted that she had earlier told the home evaluator on January 20, 2007, that she knew that the children loved both parents and that they did not want to forget them. Nevertheless, she and J.N. agreed that the parents would have no contact with the children after they gained custody on February 22, 2007.
*98 “Dr. Fred Smoot, the Director of Emory Clergy Care, is a pastoral counselor who helps clergy families through life transitions via counseling and psychotherapy. Dr. Smoot recommended that the children be placed permanently with M.N., who is a pastor, and J.N. Dr. Smoot admitted that he had not met the parents, but he stated that he had reviewed the DHR records regarding their involvement with child-protective services. L.K., the woman who had adopted the mother’s first child, also testified for M.N. and J.N. She stated that the children had bloomed under their care and that she did not believe the mother and the father were good parents.
“L.B., the mother’s sister, testified that the father had always enjoyed a good relationship with the children and that he can still properly care for them. L.B. testified that she knew that the father had left to obtain his visa, but she stated that he had always intended on returning; the only question in her mind had been when he would return. L.B. testified that the mother could also properly care for the children with assistance and that the children’s custody should be returned to the parents. J.K., an employee of the DeKalb County Department of Health, testified that she had found the mother and the father to be incredibly serene and loving people who were very good and supportive parents. J.K. believed DHR had targeted the parents and had been harassing them for years.
“Following the hearing, the guardian ad litem for the children submitted a detailed report. The guardian ad litem found that the parents obviously loved the children, but that the father’s decision to leave the children with the mother while in Guatemala was ‘so seriously flawed, it raises questions concerning his ability to provide appropriate care for the children.’ Based mainly on that premise, the guardian ad litem concluded that it was in the best interests of the children to terminate the father’s and the mother’s parental rights so that the children could be adopted by J.N. and M.N.
“On March 5, 2008, the juvenile court entered judgments terminating the parental rights of the mother and the father and leaving custody of the children with J.N. and M.N. for the purposes of facilitating the adoption of the children by J.N. and M.N. The juvenile court also entered final judgments approving the adoption of the children by J.N. and M.N. The mother timely appealed the judgments on March 11, 2008. The father filed his notice of appeal on March 14, 2008.”
12 So.3d at 102-10 (footnotes omitted).
Issues
The mother asserts that the juvenile court erred in terminating her parental rights for several reasons and that it erred in approving the adoption of the children by J.N. and M.N. Based on our disposition of J.B., supra, we address only the issues whether the juvenile court exhausted all viable alternatives before terminating the mother’s parental rights and whether the juvenile court erred in approving the adoptions.

Analysis

Parents and children have a fundamental right to maintaining their relationship that does not evaporate simply because the parents “have not been model parents or have lost temporary custody of their child to the State.” Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, *99 71 L.Ed.2d 599 (1982). “The termination of parental rights is an extreme matter and is not to be considered lightly.” SM.W. v. J.M.C., 679 So.2d 256, 258 (Ala. Civ.App.1996). “Inasmuch as the termination of parental rights strikes at the very heart of the family unit, a court should terminate parental rights only in the most egregious of circumstances.” Ex parte Beasley, 564 So.2d 950, 952 (Ala. 1990). Accordingly, before terminating parental rights, a juvenile court must exhaust all viable alternatives. Id. The purpose of the 1984 Child Protection Act, § 26-18-1 et seq., Ala.Code 1975, is “to protect the welfare of children by providing stability and continuity in their lives, and at the same time to protect the rights of their parents.” § 26-18-2, Ala.Code 1975. Therefore, “viable alternatives” are those measures or devices a juvenile court may feasibly employ to protect the welfare of, and provide permanency to, children while respecting their parents’ fundamental constitutional right to the custody, control, and companionship of those children. See D.M.P. v. State Dep’t of Human Res., 871 So.2d 77 (Ala.Civ.App.2003) (plurality opinion).
Just as we held in J.B., supra, the juvenile court in this case erred in finding that there were no viable alternatives to termination of the mother’s parental rights. The evidence clearly and convincingly shows that, because of the mother’s mental deficiency, she cannot properly meet the needs of the children independently. However, the mother’s mental deficiency does not endanger the welfare of the children when J.B. (“the father”) remains in the home to supervise the family. Consequently, rather than terminate the mother’s parental rights, the juvenile court should have placed the children in protective foster care until the father’s expected return date, ordering the DeKalb County Department of Human Resources to provide services to reunite the family at that time. J.B., 12 So.3d at 115. That plan would have allowed the integrity of the family to be maintained, securing the permanency of the children, while simultaneously preserving the mother’s right to associate with the children. 12 So.3d at 116-17 n. 23. Instead, the juvenile court erroneously concluded that the father had abandoned the children and prematurely awarded permanent custody to M.N. and J.N., 12 So.3d at 117, ultimately terminating the mother’s parental rights.
Based on our holding in J.B., and for the foregoing reasons, we reverse the judgment of the juvenile court terminating the mother’s parental rights. We also reverse the judgments approving the adoption of the children that were based, in part, on the termination of the mother’s parental rights and remand the cause for further proceedings consistent with this opinion. See J.B., 12 So.3d at 117.
REVERSED AND REMANDED.
PITTMAN, J., concurs.
THOMPSON, P.J., concurs in the result, without writing.
BRYAN and THOMAS, JJ., dissent, with writings.