26 So.3d 426 (2009)
C.S.B.
v.
STATE DEPARTMENT OF HUMAN RESOURCES.
2071120.
Court of Civil Appeals of Alabama.
April 3, 2009.
Rehearing Denied June 26, 2009.
Pamela Millsaps, Mobile, for appellant.
*427 Sharon E. Ficquette, chief legal counsel, and Karen P. Chambless, staff atty., Department of Human Resources, for appellee.
THOMPSON, Presiding Judge.
C.S.B. ("the mother") appeals from the juvenile court's judgment terminating her parental rights to A.L.C. ("the child"). That judgment also terminated the parental rights of the child's father. The father has not appealed.
On March 14, 2007, the Department of Human Resources ("DHR") filed a petition in the juvenile court to terminate the mother's parental rights as to the child, who has been diagnosed with cerebral palsy. According to the petition, the child had been in the custody of DHR since April 6, 2004. The petition asserted that the mother had been diagnosed with mild mental retardation that prevented her from being able to adequately care for the child. It also alleged abandonment and neglect.
The record contains a report prepared for the juvenile court by DHR workers that stated that DHR had received reports that the mother was placing the child at risk of serious harm. One of the DHR workers said in the report that the child's maternal grandmother had alleged that the mother was abusing the child. According to the report, DHR workers who investigated the allegations did not see any unusual marks or bruising on the child. The report stated that it was later discovered that there was a conflict between the mother and the child's maternal grandmother. Because DHR had determined that the child's safety was "questionable," it removed the child from the mother's home and placed her in foster care.
At the hearing on DHR's petition, the following evidence was adduced. The mother has an older child; her parental rights as to that child were terminated in April 2001, five months before the child in this case was born. The record does not reveal the circumstances leading to the termination of the mother's parental rights in that earlier case.
As to this case, the evidence indicated that the mother has worked diligently with DHR. The mother visited with the child every other week. Susan Gardner, who supervised foster care for the Mobile County DHR, testified that the mother had missed only one scheduled visit with the child. In that instance, Gardner said, the mother had telephoned DHR to say that she would not be able to make the visit because her father had died. However, DHR later learned that the mother's father had not died. The mother denied that she had told DHR that her father was dead, but she did admit that she had said that he was dying. The mother's father was still living at the time of the termination hearing.
Gardner also testified that the mother had completed parenting classes, had gone to counseling, and had submitted to two psychological evaluations that DHR had requested. Juanita Spinks, another DHR employee, testified that she had attended the home study that DHR had conducted at the mother's home in Jackson, where she was living with her husband at the time of the termination hearing. Spinks said that the home, a three-bedroom, two-bath mobile home, was clean, that there was adequate space in the home for the child, and that, although the home needed a few repairs outside, the results of the home study were favorable to the mother.
Tamecca Bell, another DHR employee, testified that the mother had attended an individualized service plan ("ISP") meeting, where Bell was able to see the mother and child interact. When asked whether *428 she had observed anything that caused her concern, Bell related an incident in which the mother had allowed the child to stand on the back of a chair. The mother was sitting in the chair while the child brushed the mother's hair.
Although DHR alleged that the mother was mildly mentally retarded, no expert testimony was admitted as to the mother's mental condition. DHR attempted to call as a witness Dr. John Davis, who had interviewed the mother at DHR's request. The mother's attorney objected to allowing Dr. Davis to testify and to the admission into evidence of the report that he had prepared, in which he had evaluated the mother, saying that the mother had not waived the psychotherapist-patient privilege and that anything the doctor may have learned from his evaluation of the mother was inadmissible. The juvenile court sustained the mother's objection. DHR has not appealed from the juvenile court's rulings preventing Dr. Davis's expert testimony and the admission of his report.[1]
The mother testified that she had completed the 10th grade. The mother's testimony indicated that she most likely has a diminished mental capacity. The following colloquy was had between the mother and the attorney for DHR:
"Q. [By DHR's attorney]: You know that [the child] has cerebral palsy; you know what that is?
"A. [By the mother]: She was diagnosed with it when Iwhen she was a baby. She was diagnosed, they told me, one of the doctors, gave her a bottle or one of the nurse gave her a bottle and killed her. That's why she's got cerebral palsy now. They said it killed her brain.
"Q.: [The child] died?
". . . .
"A.: Yes. She died right after she went to the [intensive-care unit].
"Q.: She died in the I.C.U.? Were you there?
"A.: No.
"Q.: Where were you?
"A.: I tried and they killed me.
"Q.: They killed you? When did they kill you?
"A.: Right before she was born.
"Q.: But you're living now?
"A.: Yeah.
"Q.: How is that?
"A.: They gave me six transfusions.
"Q.: Six transfusions of what?
"A.: Blood.
"Q.: And that brought you back to life?
"A.: Uh huh.
"Q.: And how do you know you died?
"A.: I justbefore [the child] was born my water broke and they let me bleed to death. It was at Women and Children's.
"Q.: Women and Children's let you bleed to death?
"A.: Yep.
"Q.: How do you know that you died?
". . . .
"A.: I just knew when I was fixin [sic] to go out.
"Q.: You knew when you were fixin [sic] to go out, where?

*429 "A.: When I was laying down.
"Q.: When you were laying down, you knew that you were going to die?
"A.: No. My eyes rolled back and forth in my head and (inaudible).
"Q.: So, you knew you died? Do you know how long you were dead?
"A.: For a day and a half.
"Q.: How do you know you were dead a day and a half?
"A.: I just was like in a coma.
"Q.: And how do you know you were in a coma for a day and a half?
"A.: Cause I could hear peoplewhen I'd come in and out, I could hear people talking.
"Q.: So, you didn't die, you were in a coma?
"A.: I lost my blood."
DHR workers testified that the mother had told them that she had seen between five and ten "Mexicans" drilling for oil in her backyard. The mother testified that the child's father, to whom she is not married, had been peeking in the window at her house. Further, she claimed that the child's father had raped her. She said that she had been raped five or six times, including being raped by a friend of her mother's brother and, most recently, by the "satellite dish man." She said that criminal charges arising from the alleged rape were pending against the "satellite dish man" in Clarke County. There was no evidence presented to dispute the mother's testimony on those matters.
The mother testified that she did not work because she was disabled because she has breathing problems. She said that she did not have a mental disability. She told the court that she did not drive, and that, if the child were to become ill, she would call her husband to come for them. She said that she would feed the child fruits and vegetables and that, if the child misbehaved, she would punish the child by "putting her in the corner." The mother did not know what grade the child was in at the time of the termination hearing. She also did not know how much money her husband made.
The mother's husband, who was 61 years old at the time of the termination hearing, confirmed that he and the mother had been married for one year. He testified that he was not then earning an income, but he was attempting to qualify for disability income. He also said that he had money in savings from when he was working. The mother's husband has four adult children from a previous marriage. He said that his younger two children were in college at the time of the termination hearing.
The mother contends that the juvenile court improperly terminated her parental rights to the child because, she says, DHR failed to prove by clear and convincing evidence that the child was dependent, that there were no viable alternatives to termination of her parental rights, and that she was unable or unwilling to discharge her parental responsibilities to the child, pursuant to § 26-18-7, Ala.Code 1975.
This court's standard of appellate review of judgments terminating parental rights is well settled. A juvenile court's factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. See F.I. v. State Dep't of Human Res., 975 So.2d 969, 972 (Ala.Civ.App.2007). Additionally, we will reverse a juvenile court's judgment terminating parental rights if the record shows that the judgment is not supported by clear and convincing evidence. F.I., 975 So.2d at 972. "Clear and convincing" evidence *430 has been defined as "`"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."'" J.A. v. Etowah County Dep't of Human Res., 12 So.3d 1245, 1252 (Ala.Civ.App.2009) (quoting L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App. 2002) (quoting in turn § 6-11-20(b)(4), Ala. Code 1975)). "`Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.'" Southeast Envtl. Infrastructures, L.L.C. v. Rivers, 12 So.3d 32, 48 (Ala.2008) (quoting § 6-11-20(b)(4), Ala. Code 1975).
Our juvenile courts use a two-pronged test to determine whether to terminate parental rights:
"A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights."
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ. App.2004) (citing Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990)). Section 26-18-7, Ala.Code 1975, sets forth the statutory authority for the termination of parental rights. That section provides, in pertinent part:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.

*431 "(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
". . . .
"(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.
"(c) In any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents. Nothing in this subsection is intended to prevent the filing of a petition in an abandonment case prior to the end of the four-month period."
In this case, the juvenile court found that the mother's parental rights as to one child had already been terminated; however, in this case, DHR did not present any evidence regarding the circumstances involved in that termination.
In its findings, the juvenile court also wrote:
"Although the Court finds at this time that the mother's house is adequate, and that the mother wishes to be reunited with her child, the Court finds that it is inappropriate at this time to reunify the child and the mother, and that the mother is unable to properly care for the child, and the Court having previously found that she was unable due to mental limitations to care for the child properly, and no evidence has been offered to the contrary."
From the record, it is apparent that the mother's alleged mental deficiency was the basis for DHR's decision to remove the child from the mother in the first place, as well as for its decision to seek the termination of her parental rights. In its report to the court, DHR noted that the mother "seems to love [the child], but her ability to care for her is questionable." The report then referred to the results of psychological evaluations of the mother, which the trial court declined to admit into evidence. The juvenile court, too, based its decision to terminate the mother's parental rights on her limited mental capacity.
In this case the juvenile court was called upon to balance the best interests of a child with cerebral palsy with the right of the mother to retain her relationship with the child. As this court has often noted,
"[p]arents and children have a fundamental right to maintaining their relationship that does not evaporate simply because the parents `have not been model parents or have lost temporary custody *432 of their child to the State.' Santosky v. Kramer, 455 U.S. 745, 753 (1982). `The termination of parental rights is an extreme matter and is not to be considered lightly.' S.M.W. v. J.M.C., 679 So.2d 256, 258 (Ala.Civ.App.1996). `Inasmuch as the termination of parental rights strikes at the very heart of the family unit, a court should terminate parental rights only in the most egregious of circumstances.' Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990)."
T.B. v. DeKalb County Dep't of Human Res., 12 So.3d 90, 99 (Ala.Civ.App.2008).
In this case we conclude that the juvenile court's decision to terminate the mother's parental rights was not supported by clear and convincing evidence. From the mother's testimony, we can glean that her intellectual capabilities are undoubtedly below average. However, because no doctor who has evaluated the mother was allowed to testify about or submit reports regarding those evaluations, there is no evidence as to the extent of the mother's limited mental capacity, whether the mother's mental limitations prevent her from being able to fulfill her parental responsibilities to the child, and whether the mother's condition is likely to change.
Furthermore, upon close consideration, we find that what DHR referred to in its brief as the mother's "delusions" do in fact have some basis in reality. When the mother said that she "died," she later clarified that she was actually in a coma; she described being able to hear people talking when she would "[go] in and out." The mother was able to say where she was hospitalized and that she was treated with blood transfusions. As to the testimony that the mother had said that a group of "Mexicans" were drilling for oil in her yard, her husband testified that there were individuals from an "oil-well crew" who were running lines close to their home. As to the mother's allegations that she had been raped five or six times, including being raped by the child's father, her uncle's friend, and the "satellite dish man," based on the record before us, we cannot say that such assaults did not occur.
As noted, DHR has failed to challenge on appeal the juvenile court's refusal to admit expert testimony regarding the mother's mental capacity and whether she suffered from any mental illness. DHR also failed to present evidence showing the extent of the child's cerebral palsy or how the child is affected by the condition. The juvenile court sustained the mother's objection to the testimony of DHR workers who appeared to be ready to testify as to whether, because of the cerebral palsy, the child was in need of special attention beyond what the mother is capable of providing. DHR did not appeal from the juvenile court's ruling. The child's foster father did testify, however, that the child is in private school because the child needs assistance with speech. The record does not indicate that the child has ever been abused. Other than the single incident in which the mother allowed the child to stand on the back of a chair, there is no evidence to indicate that the mother is unable to care for the child. There was no evidence tending to indicate that the mother was unable to learn or apply the concepts taught in the parenting classes that she completed or that she was unable to carry out the requirements of the ISP.
On the other hand, the undisputed evidence indicates that the mother visited the child every other week. There was only one occasion when she missed a visitation, and she informed DHR beforehand that she would not be able to make the appointment. She completed parenting classes. She attended her scheduled ISP meetings. The only example of concern about the mother's ability to care for the child that *433 DHR workers could describe was the mother's allowing the child to stand on the back of a chair to brush the mother's hair. That "incident" would not likely be viewed as rising to the level of abuse or neglect. Indeed, there is no evidence indicating that the mother ever abused the child. DHR's own report to the court indicated that, when DHR employees responded to allegations of abuse, they did not notice any marks or bruising on the child. In her testimony, the mother gave appropriate responses to parenting questions, saying she would punish the child by putting her in the corner and that she would feed the child fruits and vegetables. DHR workers acknowledged that the mother's home was clean and adequate for the child; the home study that DHR had conducted was positive. DHR acknowledged that the mother appears to love the child.
We understand DHR's concern for the child, especially in light of the child's diagnosis of cerebral palsy and the mother's apparent limited mental capacity. However, as this court has held, "[p]overty and limited mentality of a mother, in the absence of abuse or lack of caring, should not be the criteria for taking away a wanted child from the parents." In re Hickman, 489 So.2d 601, 602-03 (Ala.Civ.App.1986). Based on the evidence in the record, we cannot say that the evidence supports a finding that the circumstances in this case are so egregious as to warrant the irrevocable termination of the mother's parental rights as to the child. We conclude that the juvenile court's findings are not supported by clear and convincing evidence.
For the reasons set forth above, we reverse the judgment terminating the mother's parental rights, and we remand this matter to the juvenile court.
REVERSED AND REMANDED.
PITTMAN, J., concurs.
MOORE, J., concurs specially.
THOMAS, J., dissents, with writing, which BRYAN, J., joins.
MOORE, Judge, concurring specially.
I concur with the main opinion that the Mobile County Department of Human Resources ("DHR") did not present clear and convincing evidence of grounds to terminate the parental rights of C.S.B. ("the mother").
In its final judgment, the juvenile court stated:
"[T]he mother is unable to properly care for the child, and the Court having previously found that she was unable due to mental limitations to care for the child properly, and no evidence has been offered to the contrary."
The juvenile court apparently took judicial notice of a previous factual finding that the mental limitations of the mother prevented her from caring for the child and placed the burden on the mother to prove that the mental limitation no longer existed. However, the law places the burden on DHR, as the party seeking a judgment terminating parental rights, to present clear and convincing evidence that the parent's current conditions prevent the parent from properly caring for the child. See Ex parte T.V., 971 So.2d 1, 9 (Ala.2007). Thus, regardless of any previous factual finding based on conditions then existing, at the trial on the petition to terminate parental rights, DHR had to present clear and convincing evidence that the mother's mental limitations still persisted and that they still prevented her from being able to properly care for the child.
As to the existence of the mother's mental limitations, I agree with the dissent that expert testimony should not be required to prove an obvious mental deficit. 26 So.3d at 435 (Thomas, J., dissenting). *434 In this case, the juvenile court, as the fact-finder, could have been clearly and reasonably convinced, based on the mother's disjointed and confusing responses to direct questions, that the mother suffers some lack of comprehension and communication skills evidencing a mental problem. In fact, the juvenile court did conclude that the mother had a mental disability, and, under the ore tenus standard of review, we must defer to that finding. See Ex parte McInish, [Ms. 1060600, Sept. 5, 2008] ___ So.3d ___, ___ (Ala.2008).
However, under § 26-18-7, Ala.Code 1975, a juvenile court may not find a parent unable to discharge his or her parental responsibilities based on a mere finding that the parent has a mental limitation. The juvenile court may reach that conclusion only if it also finds, based on clear and convincing evidence, that the mental limitation is "of such duration or nature as to render the parent unable to care for [the] needs of the child." Ala.Code 1975, § 26-18-7(a)(2). In this case, the juvenile court did find that, because of her mental disability, the mother was unable to properly care for the child; however, it did not base that finding on any evidence contained in the record. The record contains no evidence, much less clear and convincing evidence, indicating that the mother's mental disability has ever or will ever prevent her from being able to care for the needs of the child.[2]
Apparently, DHR attempted to prove that the child has special needs that require care that is beyond the mental capabilities of the mother; however, the juvenile court thwarted those attempts by excluding the testimony of the psychologist who examined the mother and by excluding the testimony of several witnesses regarding the needs of the child. I believe the juvenile court erred in those rulings, but DHR did not make any offer of proof or file a cross-appeal; therefore, we cannot hold the juvenile court in error as to those matters. ___ So.3d at ___. Without the necessary evidence of the effect of the mother's mental limitations on her ability to care for the child, we cannot affirm the judgment terminating the parental rights of the mother. Even under the ore tenus standard of review, we may affirm a judgment only if the factual findings underpinning that judgment are supported by sufficient evidence contained in the record. See McInish, supra.
That being said, I note that, by reversing judgment in this case, we are simply holding that DHR did not present sufficient evidence to support the judgment terminating the parental rights of the mother. We are not holding that the mother is entitled to custody of the child; that matter is not before us on this appeal.
THOMAS, Judge, dissenting.
I respectfully dissent because I believe that this court, in the main opinion reversing the juvenile court's judgment terminating the mother's parental rights, has reweighed the evidence. A juvenile court's factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1183 (Ala. Civ.App.2007).
"This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their *435 demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. `In child custody cases especially, the perception of an attentive trial judge is of great importance.' Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ. App.1981)."
Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001).
The conclusion of the main opinion  that the evidence was insufficient to support a judgment terminating the mother's parental rights  fails to give proper consideration to the specific findings of the juvenile court. Although it is true that the juvenile court heard no expert testimony regarding the effect of the mother's mental limitations, the juvenile court, nonetheless, found:
"[T]he mother is unable to properly care for the child, and the Court having previously found that she was unable due to mental limitations to care for the child properly, and no evidence has been offered to the contrary."
Because the mother's mental deficiencies and delusions were readily apparent from her testimony, the juvenile court, which heard that testimony and observed the mother's obvious intellectual limitations, was not plainly and palpably wrong in finding that the mother was unable, due to her mental limitations, to properly care for the child. When a witness's mental deficiency is readily apparent to the fact-finder, expert testimony is not indispensable. See Beavers v. State, 634 S.W.2d 893, 898 (Tex.App.1982)(holding that defense counsel was not ineffective for failing to present, for purposes of impeachment, expert psychological testimony as to the mental deficiency of the State's eyewitness when "[t]he record itself clearly show[ed] that during [the eyewitness's] testimony, his mental deficiency and his capacity should have been thoroughly apparent to the jury").
The main opinion notes that, although the mother's parental rights to another child had previously been terminated, the record does not indicate the basis for that termination. The juvenile court, however, was required to consider that prior termination in weighing the effect of the mother's obvious mental limitations on her ability to care for the child. See § 26-18-7(a)(8), Ala.Code 1975 (stating that, "[i]n determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider . . . [t]hat parental rights to a sibling of the child have been involuntarily terminated").
The role of this court in viewing the sufficiency of the evidence is strictly to determine whether a reasonable fact-finder could be clearly convinced that the mother's mental limitations rendered her unable to provide proper care for the child. We are not permitted to reweigh the evidence. It is a "well-established and fundamental principle of appellate review that the weighing of evidence presented ore tenus . . . is to be performed by the trier of fact, not the appellate court." Ex parte McInish, [Ms. 1060600, Sept. 5, 2008] ___ So.3d ___, ___ (Ala.2008).
"`[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly establish the fact sought to be proved. Even if an appellate court in considering the evidence of record would reach its own conclusion that the evidence presented does not clearly and convincingly establish the fact sought to be proved, it is *436 not for that court to act upon its own factual determination but to determine instead whether the fact-finder below reasonably could have made a different finding based on the same evidence.'"
Ex parte McInish, ___ So.3d at ___ (quoting KGS Steel, Inc. v. McInish, [Ms. 2040526, June 30, 2006] ___ So.3d ___, ___ (Ala.Civ.App.2006) (Murdock, J., concurring in the result)).
BRYAN, J., concurs.
NOTES
[1] We note that Rule 503(d)(5), Ala. R. Evid., provides an exception to the psychotherapist-patient privilege in those cases in which "relevant communications offered in a child custody case in which the mental state of a party is clearly an issue and a proper resolution of the custody question requires disclosure." However, because DHR did not cross-appeal as to the juvenile court's ruling excluding Dr. Davis's testimony as to the relevant communications and did not make an offer of proof as to the contents of the excluded psychological records, we cannot consider any information contained in those records.
[2] Any conclusion that the mother's mental disability prevented her from caring for her previous child, as to whom the mother's parental rights were terminated, would be mere speculation on our part because DHR presented no evidence as to the circumstances leading to that termination.