Rel: June 12, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

————————————————

### CL-2025-1038

————————————————

## A.Q.

### v.

## Cullman County Department of Human Resources

————————————————

### CL-2025-1060

————————————————

## C.S.Q.

### v.

## Cullman County Department of Human Resources

### Appeals from Cullman Juvenile Court
### (JU-24-344.02)

CL-2025-1038 and CL-2025-1060

FRIDY, Judge.

A.Q. ("the mother") and C.S.Q. ("the father") appeal from a judgment of the Cullman Juvenile Court ("the juvenile court") terminating their parental rights to their child, C.Q. ("the child"). For the reasons set forth herein, we reverse the judgment.

Background

The Cullman County Department of Human Resources ("DHR") filed in the juvenile court a petition seeking the termination of the mother's and the father's parental rights on September 19, 2025, more than sixteen months after it took custody of the child. The juvenile court scheduled a trial on the petition for December 3, 2025. On December 2, 2025, the father filed a motion asking the juvenile court to order his transport from the Cullman County detention facility so that he could attend the December 3, 2025, trial. As grounds for his request, the father argued that the termination of parental rights is "one of the most serious matters a parent can face" and that his "right to be present at the trial should not be compromised." There is no written order pertaining to the father's motion to transport, but, at the outset of the trial, the juvenile court noted for the record that it had denied that motion. The father was

2

not present for the trial; however, he was represented by counsel at the trial.

Kindal Beach, a DHR investigation supervisor, testified at the trial that DHR first became involved with the family when the child was born in November 2022 because the mother tested positive for THC. Beach said that DHR did not intervene then, however, because the mother reported that she was using delta-8, a psychoactive cannabinoid; the hospital staff did not have any concerns about the parents' behavior at the hospital; and the child's drug screen was negative.

In April 2024, about sixteen months after the child was born, DHR received a report from Hanceville law-enforcement officials that a female was heard screaming in the parents' apartment complex. Once officials were able to open the door to the parents' apartment, they saw that the mother had red marks around her neck and throat. Beach testified that the parents gave several explanations for the red marks, saying that they were the result of a sexual encounter, that the mother made the marks herself, and that the father made the marks while he was trying to calm the mother during a "mental-health episode." Law-enforcement officials arrested the father and charged him with domestic violence; DHR took

the child into its care pursuant to a safety plan. That evening, Beach said, the person caring for the child under the safety plan noticed an abnormal amount of bruising on the child and notified DHR. The child was returned to DHR the next morning, Beach said, because his caretakers said that he had cried all night and they could not handle him. After a shelter-care hearing, the child was placed in foster care. Beach said that, when the child first entered foster care, DHR workers were concerned because of the mother's mental-health issues. The mother reported that she was using marijuana to help her sleep and that she was not treating her bipolar disorder.

Stephanie Tate, a DHR foster-care worker, testified that she worked with the parents from April 2024 until July 2025 to try to reunify them with the child, who was three years old at the time of the trial. She said that DHR tried to assist the parents with sobriety, attempted to have them participate in drug screens, located services that it believed could benefit the parents, and provided psychological evaluations and supervised visitation to the parents. While Tate was working with them, the parents participated in the psychological evaluations but did not avail themselves of the other services DHR offered. They did participate

4

in visitation, however, and Tate said that, after she had had a few conversations with the parents, they began bringing appropriate foods for the child. During the visits, Tate said, the parents struggled with the child's temper. She said that she knew that they loved the child, but, she said, when the child had a "meltdown," the father especially would start using loud language and cuss. On one occasion in April 2025, Tate said, the foster parent had to intervene to calm the child down because both parents were frustrated.

Tate said that, toward the end of her time working with the parents, her communication with them was limited. She said that the parents took only two or three drug screens while she worked with them and that, in April 2025, they refused the last drug screen she asked them to take. Of the drug screens the parents took, Tate said, all of them were positive for THC and methamphetamine "at higher levels," and the father also tested positive for morphine, suboxone, and other drugs. Tate testified that, in August 2025, she told the mother that the mother had failed a drug screen and that the mother initially told her that it was because she used hemp shampoo. The mother then told Tate that, on the night the child was removed from her care, she and a neighbor had smoked marijuana

5

and that that was probably why she had had a positive drug screen. The father was open with Tate about his drug use.

Tate said that, after working with the parents for about fifteen months, they had not shown any improvement toward resolving their issues with drug use, unstable housing, and unstable employment and could not maintain reliable transportation. Therefore, she said, DHR believed that the child was at an increased risk of neglect and harm. After April 2025, Tate said, she did not hear anything more from the parents. She said that the parents' telephones "were on and off," that there was no home address where DHR could send letters to them, and that the parents did not communicate with DHR.

The mother testified that, when DHR had become involved with the family, they were being evicted "due to poor choices and a lousy husband." Tate said that, when she started working with the family, they were homeless; they moved into a hotel in August 2024 and lived there until December 2024, when they were evicted for nonpayment and once again became homeless. After December 2024, Tate said, the mother and the father lived with two individuals who DHR knew had a history of drug

6

use. She said that March 2025 was the last time that she had "decent communication" with the parents.

Tate said that the mother, who had a history of mental illness, was not caring for her mental-health needs and was not seeking any psychiatric care or treatment. She said that the mother had told her that she had attempted to obtain disability benefits for her mental-health issues but had been denied. Tate said that she told the mother that if she had been denied several times, she could perhaps obtain employment that would allow her to have some stability and, toward that end, suggested employment options within walking distance of the hotel where the mother and the father lived. Because the mother and the father had been evicted twice, Tate said, they had difficulty in securing appropriate housing.

Tate said that the primary concerns DHR had with the parents when she first began working with them were their instability, domestic-violence and anger-management issues, and lack of protective capacity. The parents took an anger-management course; however, Tate said, she and a court-appointed special advocate each had completed the course in six minutes by paying a fee and printing out a certificate. DHR asked the

parents to take an anger-management course through DHR, but, Tate said, they told her they had completed an eight-hour course, and the father told her that "'[he] moved the mouse.'" Apparently, the program shut off if the participant did not move the computer mouse, Tate said. The father was honest about having anger problems, Tate said, but he told her that the mother caused most of his anger. Tate said that the father told her that he did not believe that he needed to treat his anger issues and that his anger with the mother and with his former wife "were simply their faults." She said that the father also became frustrated with the child for little things like his inability to figure out a safety belt. Tate said that, at the time of the trial, aside from the services that the parents had not participated in, she did not know of any other services that DHR could offer to the parents to help them with reunification efforts.

Tate testified that, when the child entered foster care, he was behind developmentally, socially, and emotionally. For example, she said, the child was not very mobile and was unable to communicate. The parents had provided the child with "food pouches" instead of actual food, Tate said, so he had difficulty swallowing at first. DHR placed the child in early intervention and occupational therapy; he also participated in a

8

speech evaluation, and, in February 2025, he began play therapy. By the December 5, 2025, trial, she said, the child had finished physical therapy and occupational therapy, had learned how to eat, and had made progress in his speech and his ability to play. Melissa Welch, the DHR social worker who began working with the family in July 2025, when Tate stopped working with them, testified that the child did not have any emotional or physical limitations that would prevent him from being adoptable.

Dr. Barry Wood, a clinical psychologist, performed psychological evaluations on the mother and the father in January 2025. He said that his evaluation of the father indicated that he was "subject to features" of antisocial personality disorder and narcissistic personality disorder, which, he said, are resistant to treatment. He also noted that the father admitted to having a history of substance abuse. Dr. Wood testified that his immediate concern regarding the father was his use of cannabis and that his long-term concern was the personality disorder. Those concerns, he said, gave him pause about the father's ability to safely care for a young child. Dr. Wood said that he recommended that the father comply with mandates DHR imposed, which, he said, the father told him

included an evaluation by mental-health professionals, participating in random drug screens, and maintaining adequate housing and employment. Dr. Wood also recommended that the father complete, at the least, an outpatient substance-abuse program. Tate said that the father did not follow through with DHR on Dr. Wood's recommendations.

Dr. Wood said that the mother reported a history of depression and anxiety as well as bipolar disorder and that she attempted to self-medicate by smoking marijuana. He recommended that she stop marijuana use and seek psychiatric help. He also said that, in addition to her substance use and bipolar disorder, he could not rule out the possibility that she suffered from a personality disorder. He diagnosed her with cannabis-use disorder, bipolar disorder, and an unspecified personality disorder. He said that he recommended that the mother comply with DHR's mandates, including compliance with random drug screens, completion of anger-management training and parenting training, and participation in a substance-abuse evaluation and a psychotropic-medication evaluation. He also recommended that the mother be told that if she continued to have issues related to substance

10

abuse, such as a positive drug screen or other problems, she would be required to complete a substance-abuse-treatment program.

Welch testified that, at the mother's most recent drug screen in September 2025, the mother had tested positive for marijuana, amphetamine, and methamphetamine; the levels for amphetamine and methamphetamine were both relatively high, she said. Welch said that, at an individualized-service-plan ("ISP") meeting, the mother explained to DHR that she had smoked marijuana with a friend and that "they must have laced the marijuana."

Welch testified that, after she began working with the parents, the mother had initially refused to take a drug screen, but, when Welch asked her again, she agreed to submit to the screen, which came back positive for drug use. Welch also said that the parents had not offered any financial or material assistance toward the child's care since he entered foster care. According to Welch, the father had been incarcerated awaiting the outcome of criminal charges against him, and he had not been involved in services or visits with the child since she had been involved with the case. She said that the child needed permanency and

stability and that, because of the amount of time the case had been open, DHR was advocating for the termination of the parents' parental rights.

Welch testified that the mother was admitted to Bradford Health Services ("Bradford") at the end of September 2025, the day after the last ISP meeting, and completed a substance-abuse program there at the end of October 2025. Tumika Noblett, a DHR employee, testified that, in November 2025, the month before the trial, she had reached out to the mother to obtain a records-release form from her so that DHR could obtain her treatment records from Bradford. Welch said that, although the mother had told her that she had put Noblett's name on the release forms, neither she nor Noblett had received any documents from Bradford as of the day of the trial. The mother testified that she had talked with Bradford daily to try to get the paperwork that she needed to complete to have her records released to DHR.

Noblett said that the mother had provided her with a new address in Shelby County and had told her that she had applied to work as a delivery driver for Amazon, an online retailer. Welch testified that the mother told her that she was staying with her former husband in Alabaster, but Welch stated that she had not been to that residence.

12

Later in November, Noblett said, the mother contacted her to tell her that she had gotten the job with Amazon, so she would be unable to participate in future ISP meetings and in color-code drug testing. The mother told Noblett that if DHR needed drug screens, it could get them from Amazon.

The mother testified that, in the three months leading up to the trial, she had voluntarily entered rehabilitation at Bradford, which was also treating her for bipolar disorder. Three weeks before the trial, the mother said, she began working ten to twelve hours a day, five or six days a week, delivering packages for Amazon; however, she later testified that she worked twenty to thirty-five hours a week because she was still in training. Digital pay information indicated that the mother earned $20.50 an hour. After the first of the year, the mother said, she would work as a dispatcher for the delivery trucks. The mother said that, in the three months leading to the trial, she had abstained from alcohol and drugs, had taken a drug screen for Amazon that had produced a negative result, and had recently quit smoking cigarettes. The day of the trial was her sixty-first day of sobriety, she said. The mother also testified that she had a meeting scheduled in January 2026 with a lawyer to commence divorce proceedings against the father, who, she said, had been a

negative influence in her life. She said that "drugs and stupidity" caused her to delay getting the help that she needed.

The mother said that, at the time of the trial, she lived with her former husband and their nine-year-old child, whom they coparented.[1] Her former husband testified that he was prepared to let the mother and the child live with him for "an unlimited amount of time." The mother said that she and her former husband divorced in June 2022, that, by agreement, the former husband had "custodial guardianship" of their child so that he could enroll her in school, and that they shared "joint custody," although, she said, there was no court order involved and no child support had been ordered. Her former mother-in-law, who had had a stroke, also lived with the former husband. The mother said that she had needed to move away from Cullman County because that was where she would get high and where she had connections.

The mother testified that she believed that it was in the child's best interest to be with her and the child's half sibling and to be surrounded

---

[1]The mother testified that her birthdate was April 25, 1999, and that she was thirty-four years old. If that birthdate is correct, then, on December 3, 2025, the day of the trial, the mother would have been twenty-six years old.

by family. She said that she stays in a room in the former husband's house that is away from the family so that she and the child can reconnect and she can parent the child without her former husband's involvement. She said that she could provide for the child, and, when asked whether she had heard that the child had some "delay issues," the mother responded by describing the day-care facility where the child would attend, noting that the child's older half sibling had gone there and was in an advanced class for math and engineering.

When the child was first taken into foster care, Beach said, the mother provided DHR with her sister's name as a possible relative placement. However, a DHR worker recognized the sister from a previous report, and DHR determined that the sister was not an appropriate placement for the child. The mother did not provide DHR with any other names of relatives at that time, Beach said. Tate testified that, when she worked with the family, she sought out family resources for the child, and, although she believed that she had identified some that were appropriate, they had declined to serve in January 2025. The child's maternal grandmother had a history with DHR, Tate said, and the mother advised her that the maternal grandmother used drugs. The

15

mother did not want the child placed with the maternal grandmother. The mother also identified her former husband, J.C., as a possible resource. When she contacted J.C., Tate said, he told her he was an amputee and was unable to manage a toddler.

Tate said that the child's paternal grandmother was in poor health and unable to care for the child and that she had a history with her own children with DHR. The father's eighteen-year-old son was identified as a relative resource, but he was denied because, Tate said, it was not appropriate for an eighteen-year-old to take on caring for a two-year-old. Additionally, Tate said, the father's eighteen-year-old son lived with his own mother, who was the father's ex-wife, and she said that she did not want the child in her home. The father's two siblings were appropriate, Tate said, but one of the siblings reported that the father had threatened to kill her in January 2025, and both siblings told DHR that they did not feel safe bringing the child into their homes.

On cross-examination, Tate was asked whether the mother's possible biological father, who lived in Kentucky, or her legal father had been explored as possible relative resources. Tate said that she had not seen any information regarding those two men. Welch testified that the

16

mother had told her that she did not know whether the man in Kentucky actually was her biological father, so, the mother said, they were going to have a DNA test performed and she would notify Welch of the results. Welch said that she could not reach out to the mother's possible biological father until DHR had verified that he was a relative. The line of questioning ended without Welch confirming whether the man in Kentucky was, in fact, the mother's biological father. Welch said that the mother had not told her about her legal father. The mother testified that her possible biological father and his wife were willing to take in the child and had purchased bedroom furniture for him.

On December 5, 2025, the juvenile court entered a judgment finding that the mother and the father had failed to comply with DHR's recommendations and had been unable to make improvements to their situation. It also found that the child was in need of permanency and stability. It found that clear and convincing evidence demonstrated that the mother and the father were unable or unwilling to discharge their responsibilities to and for the child and that their conduct or conditions were unlikely to change in the foreseeable future. Finally, the juvenile court found that there were no relative resources available who were

17

appropriate for the child for either temporary or permanent placement. Based on its findings, the juvenile court terminated the parental rights of both the mother and the father and ordered that the child was freed for adoption.

The mother and the father filed separate motions to alter, amend, or vacate the judgment, which the juvenile court denied. They appealed separately, and, on December 19, 2025, this court entered an order consolidating the appeals.

Standard of Review

In reviewing a juvenile court's judgment terminating a parent's parental rights, this court must determine whether the record contains clear and convincing evidence to support the judgment. See J.H. v. Bibb Cnty. Dep't of Hum. Res., 261 So. 3d 1229, 1232 (Ala. Civ. App. 2018). Clear and convincing evidence is "'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting § 6-11-20(b)(4), Ala. Code 1975). See also Ex parte McInish, 47 So. 3d 767, 776 (Ala. 2008).

Our task in reviewing a judgment terminating parental rights is not to reevaluate the evidence but rather "to specifically consider whether the juvenile court could have reasonably reached the conclusion that it did." Ex parte Bodie, 377 So. 3d 1051, 1060 (Ala. 2022) (emphasis omitted). When the juvenile court's findings are based upon ore tenus evidence, we presume that those findings are correct unless they are plainly and palpably wrong. See C.S.B. v. State Dep't of Hum. Res., 26 So. 3d 426, 429 (Ala. Civ. App. 2009); Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). We review a juvenile court's conclusions of law de novo. See J.W. v. C.B., 68 So. 3d 878, 879 (Ala. Civ. App. 2011).

## Analysis

The mother first contends that the record does not contain clear and convincing evidence that grounds for terminating her parental rights existed or that her current conditions warranted the termination of her parental rights. Instead, she argues, the evidence indicated that, at the time of the trial, she had demonstrated "significant efforts" to adjust her circumstances to resolve her substance-abuse problems and to be a suitable custodian for the child. The father does not challenge the juvenile court's finding that grounds existed for the termination of his

19

parental rights; therefore, our analysis regarding this issue pertains only to the mother.

A juvenile court may terminate a parent's parental rights if the party seeking the termination proves, by clear and convincing evidence, that (1) one of the grounds for termination specified in § 12-15-319(a), Ala. Code 1975, exists and (2) no viable alternative to terminating the parent's parental rights exists. See J.C.L. v. J.B.L., 370 So. 3d 254, 262 (Ala. Civ. App. 2022). Under § 12-15-319(a), grounds for terminating parental rights exist if clear and convincing evidence supports a finding that the parents "are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future." The statute provides a list of thirteen nonexhaustive factors a court should consider in determining whether grounds exist for terminating parental rights. Among those factors are evidence of a parent's mental illness or "excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for the needs of the child," § 12-15-319(a)(2); that reasonable efforts by DHR to assist the parent

toward reunification with the child have failed, § 12-15-319(a)(7); that the parent has failed to provide for the material needs of the child, § 12-15-319(a)(9); and that a parent has demonstrated a lack of effort to adjust his or her circumstances to meet the needs of the child, § 12-15-319(a)(12). From a timing standpoint, "the existence of evidence of current conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence." D.O. v. Calhoun Cnty. Dep't of Hum. Res., 859 So. 2d 439, 444 (Ala. Civ. App. 2003) (emphasis omitted).

The evidence, as previously outlined, indicates that the mother has a history of mental illness that she was failing to treat, a history of substance abuse, and a history of an inability to maintain steady housing and employment. She also failed to provide any material support for the child while the child was in foster care. However, as the mother points out, in the three months leading up to the trial, she finally took the steps toward reunification that DHR had been asking her to take since the child was first taken into custody at least a year and a half earlier. She had been employed for three weeks, had made plans to divorce the father,

21

on whom she blamed a lot of her problems, and had moved in with her former husband, who had custody of his and the mother's child. After the last ISP meeting in September 2025, the mother sought treatment at Bradford for her drug abuse, and, she said, she was also receiving treatment for her mental illness through Bradford.

However, the evidence also indicated that she had abused illegal drugs throughout the vast majority of the child's life; the mother used drugs while she was pregnant with the child, and the results of her drug screens while the child was in DHR's care indicated that she had continued to take illegal drugs throughout the proceedings. She had been sober only sixty-one days at the time of the trial, and that period included the time that she was at Bradford. The juvenile court could have been clearly convinced that, given the mother's history of drug use, sixty-one days was not a sufficient time to ensure that the mother could remain sober and successfully parent the child. Indeed, the juvenile court was entitled to consider the mother's late attempts to cooperate with DHR "to be merely unpersuasive, last-minute efforts intended only to forestall termination rather than legitimate efforts by the mother to change her circumstances." K.H. v. Madison Cnty. Dep't of Hum. Res., 384 So. 3d

22

641, 655 (Ala. Civ. App. 2023). See also A.M.F. v. Tuscaloosa Cnty. Dep't of Hum. Res., 75 So. 3d 1206, 1213 (Ala. Civ. App. 2011); K.J. v. Pike Cnty. Dep't of Hum. Res., 275 So. 3d 1135, 1145 (Ala. Civ. App. 2018). Based on the totality of the evidence, we cannot conclude that the juvenile court's determination that grounds existed for the termination of the mother's parental rights was plainly and palpably wrong.

The mother also contends that clear and convincing evidence does not support the juvenile court's conclusion that the second prong necessary to terminate her parental rights was met, that is, whether clear and convincing evidence supported the juvenile court's determination that no viable alternative to termination existed and that termination would serve the best interests of the child.[2] The mother more

---

[2]In its responsive brief, DHR contends that this issue was not preserved for appellate review. In its judgment, the juvenile court made limited factual findings, including that there were no viable alternatives to the termination of the parents' parental rights and that DHR had explored relative resources but had not found any that were appropriate. The mother filed a motion to alter, amend, or vacate in which she set forth a number of factual assertions. Although she never explicitly challenged the sufficiency of the evidence, she ended her motion with the statement that the judgment "should be reconsidered." Although this case presents a close question as to whether the issue was preserved, see New Props., L.L.C. v. Stewart, 905 So. 2d 797, 801-02 (Ala. 2004), we conclude that it was.

specifically argues that, because DHR allegedly failed to present evidence regarding whether an adoptive resource had been identified for the child or whether the child was adoptable, the juvenile court erred in terminating her parental rights. She contends that permanency through adoption is an "essential element of DHR's case that must be proved" before the juvenile court could properly terminate her parental rights. The mother's brief at 27.

When DHR seeks to terminate a parent's parental rights, the juvenile court must consider "whether the termination the government seeks furthers a compelling governmental interest." M.P. v. DeKalb Cnty. Dep't of Hum. Res., 394 So. 3d 1080, 1086 (Ala. Civ. App. 2023). "Such compelling interests may include, for example, protecting children from abuse and neglect and establishing stable and permanent home environments for at-risk children." Id. Assuming the existence of a compelling governmental interest, the question a court must answer next is whether terminating the parent's parental rights is necessary to advance that compelling interest, or, put another way, a court "must consider whether the government seeks to advance its interest in a

24

manner that infringes the parent's parental rights in the narrowest manner possible." Id.

Here, the child's placement in foster care has protected him from abuse and neglect at the hands of his parents, so the question that arises is whether termination is necessary to support a different governmental interest, such as establishing a stable and permanent home environment for the child. Termination could be the narrowest way possible to advance that interest if, by terminating the parents' parental rights, the state could provide the child with a stable and permanent home environment through adoption. However, if the evidence provides no basis for believing that the child will not simply remain in foster care regardless of the termination of the parents' parental rights, there would be no basis on which to conclude that the government, by that termination, has advanced a compelling interest. That appears to be the case here.

This case is similar to D.M. v. Dale County Department of Human Resources, 413 So. 3d 750, 755-56 (Ala. Civ. App. 2024), in which this court reversed judgments terminating the parents' parental rights after determining that the Dale County Department of Human Resources ("the Dale County DHR") had not demonstrated that the termination would

lead to the permanency and stability that it was intended to achieve. In D.M., the children at issue had special needs -- one child had asthma and autism that affected his behavior and speech and the other child had been diagnosed with anxiety -- which, we said, impeded their adoption prospects. D.M., 413 So. 3d at 754. Additionally, the children's foster mother testified that the children should be kept together because one of them thrived when he was with his sibling. Id. In terminating the parents' parental rights, the juvenile court in that case found, among other things, that "it would be in the best interests of the children to terminate the parental rights of the mother and the father so that the children could be freed for adoption." Id.

In analyzing whether termination of the parents' parental rights were in the children's best interests, we quoted from our opinion in J.A. v. S.L., 406 So. 3d 129 (Ala. Civ. App. 2024), in which we wrote that, to properly terminate a parent's parental rights, "'at a minimum'" the juvenile court was to "'focus on whether termination of the legal relationship between the child and the parent will protect the welfare of the child and promote the stability and permanency of the child.'" D.M., 413 So. 3d at 755 (quoting J.A., 406 So. 3d at 140). We pointed out that

26

the foster parents had not testified that they intended to adopt the children and that the Dale County DHR had not presented evidence indicating that it had identified any other adoptive resource or that the children would likely be adopted. Id. Under those circumstances, we held, "the juvenile court could not have reasonably determined that adoption was a likely outcome for the children or that their permanency interests would be advanced by termination of the mother's and the father's parental rights." Id. at 756.

In this case, the juvenile court did not make a specific finding that termination of the parents' parental rights would be in the best interests of the child. It also made no specific finding that the child was adoptable. In terminating the parents' parental rights, the juvenile court granted DHR the authority to proceed with permanent plans and placement for the child. However, our review of the record indicates that DHR failed to present any evidence, including any ISPs, establishing a permanency plan for the child. The child's foster parents did not testify, and no one from DHR indicated that the foster parents intended to adopt the child or that any other adoptive resource had been identified for the child.

T.W. v. Calhoun County Department of Human Resources, 391 So. 3d 306 (Ala. Civ. App. 2023), involved the termination of parental rights of the parents of one child who had been diagnosed with ADHD and required medication for that disorder, as well as educational assistance, and of a second child who had a speech impediment who required biweekly therapy sessions. We found that, under the Department of Human Resources regulations, the children qualified as special-needs children, and the juvenile court in that case was required to consider whether the children would likely achieve permanency through adoption. Id. at 316 (citing Ala. Admin. Code (Dep't of Hum. Res.), r. 660-5-22-.06 (defining a special-needs child, for the purposes of subsidized adoption, as, among other things, a child who is over five years of age; who is in a group of two or more siblings seeking joint adoption; who has a physical disability; or who is receiving ongoing medical treatment for an emotional or behavioral issue)). We held that, under the circumstances, "it was incumbent upon [the Calhoun County Department of Human Resources] to present clear and convincing evidence of the viability of adoption so that the juvenile court could make an informed evaluation and decision." Id.

In this case, at the time of the trial, the child had not completed speech therapy and was still attending play therapy; thus, he may have qualified as a child with special needs under Department of Human Resources regulation 660-5-22-.06(2)(a)2.(ii) (describing a special-needs child as a child who "has a known emotional disturbance/behavioral issue that requires on-going treatment and that has been documented by a mental health professional"). At the very least, the evidence demonstrates that the child has an ongoing need for services. Welch testified that the child was adoptable; however, she offered no basis for her belief despite the undisputed evidence regarding the child's speech limitations and his continued involvement in play therapy. In short, her unsupported statement is merely conclusory, which does not rise to the level of clear and convincing evidence. See Reid v. Jefferson Cnty., 672 So. 2d 1285, 1290 (Ala. 1995) (holding that statement in an affidavit that a bridge hampered ingress to and egress from party's property was conclusory and did not constitute substantial evidence). The lack of evidence demonstrating the viability of adoption for the child, coupled with the lack of the identification of an adoptive resource or even a permanency plan for the child, leads us to conclude that the juvenile court

29

did not have sufficient evidence from which to conclude that the child was likely to achieve the permanency and stability that termination of the mother's parental rights was intended to achieve, and, therefore, it could not properly terminate those rights.

In his appellate brief, the father also challenged the juvenile court's determination that there were no viable alternatives to the termination of his parental rights, albeit on the general ground that DHR did not perform due diligence in determining whether there existed a less restrictive means than termination of his parental rights and his contention that DHR workers were unaware whether certain relative resources existed. In W.A. v. Calhoun County Department of Human Resources, 211 So. 3d 849 (Ala. Civ. App. 2016), a juvenile court terminated both the mother's and the father's parental rights. This court reversed the portion of the judgment terminating the father's parental rights after determining that the Calhoun County Department of Human Resources ("the Calhoun County DHR") had failed to make reasonable efforts to reunite the father and the child. Regarding the judgment terminating the mother's parental rights, we observed that the Calhoun County DHR was not under a duty to make reasonable efforts to reunite

the mother and the child, which was apparently the issue the mother raised on appeal. Id. at 853. However, because we had reversed the judgment terminating the father's parental rights, we also reversed the judgment terminating the mother's parental rights, explaining that "the father may prove to be a suitable custodian who could supervise visitation of the mother and the child, which would be a viable alternative to terminating the mother's parental rights." Id. Here, if the mother's circumstances continue to improve and she can later demonstrate the stability DHR requests of her, she, too, may one day be a suitable custodian for the child who could supervise visitation with the father.

Accordingly, the judgment terminating the parental rights of the mother and the father must be reversed. Because we are reversing the judgment, we pretermit discussion of the remaining issues the parents assert in their respective briefs.

Conclusion

The record lacks sufficient evidence from which the juvenile court could determine that the termination of the parents' parental rights was likely to achieve the permanent and stable home for the child that the termination was intended to achieve or that the termination was in the

child's best interests. Therefore, we reverse the judgment terminating the parents' parental rights, and we remand the case to that court to take further action consistent with this opinion.

CL-2025-1038 -- REVERSED AND REMANDED.

CL-2025-1060 -- REVERSED AND REMANDED.

Moore, P.J., and Edwards and Hanson, JJ., concur.

Bowden, J., concurs in the result, without opinion.